**UNITED STATES of America**

v.

**Michael Stanley GREEN a/k/a M. S. Greene, and Lulseged Tesfa a/k/a H. Teffa.**

**Appeal of Lulseged TESFA.**

**No. 74–2283.**

United States Court of Appeals, Third Circuit.

Argued Sept. 7, 1976.

Decided Oct. 21, 1976.

---

Alan M. Lerner, Philadelphia, Pa., for appellant.

J. Clayton Undercofler, III, Asst. U.S. Atty., Walter S. Batty, Jr., Asst. U.S. Atty., Chief, Appellate Section, Carmen C. Nasuti, Asst. U.S. Atty., Asst. Chief, Crim. Div., Philadelphia, Pa., for appellee.

Before VAN DUSEN, HUNTER and WEIS, Circuit Judges.

OPINION OF THE COURT

VAN DUSEN, Circuit Judge.

Lulseged Tesfa has appealed from a conviction under 49 U.S.C. § 1472(i) (1970) [1] on two counts of air piracy which occurred during July 12 and 13, 1972. For the reasons stated in the district court opinion, *United States v. Tesfa*, 404 F.Supp. 1259 (E.D.Pa.1975), and in this opinion, the judgment and commitment of the district court will be affirmed.

The defendant and his fellow conspirator, Michael Stanley Green, were arrested on July 13, 1972, while still aboard one of the hijacked aircraft.[2] An apparent suicide attempt and other behavior by the defendant, shortly after his arrest, raised the question of his competency to assist in his defense and to stand trial. Consequently his trial was severed from that of his co-defendant, and he was sent to the Medical Center for Federal Prisoners, Springfield, Missouri (hereinafter Springfield), pursuant to 18 U.S.C. § 4244. See *United States v. Pogany*, 465 F.2d 72, 77 (3d Cir. 1972).

Tesfa remained at Springfield until December 18, 1972, when it was ordered that he be discharged and returned to the Eastern District of Pennsylvania for trial. Prior to the time of his discharge, he was examined by the Springfield staff pursuant to a court order. The staff's consensus report, dated October 31, 1972, indicated that the defendant was malingering.[3] This report was signed by Dr. Robert Jack Eardley, then the Deputy Coordinator for Mental Health, Springfield, and three other staff physicians.

On February 1 and 2, 1973, the trial court held its first competency hearing concerning this defendant, at which the testimony of several experts was received, including that of Dr. Eardley who testified as the court-appointed expert under 18 U.S.C. § 4244. After this hearing, the defendant was adjudged competent to stand trial. The defendant was incarcerated in Holmesburg Prison, Philadelphia, to await his trial.

On May 14, 1973, because of information received from the Holmesburg medical staff, the trial judge held another competency hearing, adjudged the defendant to be incompetent, and ordered him to be returned to Springfield. Among those who testified at the May 1973 hearing that the defendant was incompetent was Albert Levitt, Chief Psychologist for the Court of Common Pleas of Philadelphia County.[4]

Upon his return to Springfield, the defendant was observed and examined by the staff over a prolonged period. However, as early as December 1973, the staff concluded

---

1. Section 1472(i) provides:

    "(i)(1) Whoever commits or attempts to commit aircraft piracy, as herein defined, shall be punished—

    "(A) by imprisonment for not less than 20 years; or

    "(B) if the death of another person results from the commission or attempted commission of the offense, by death or by imprisonment for life.

    "(2) As used in this subsection, the term 'aircraft piracy' means any seizure or exercise of control, by force or violence or threat of force or violence, or by any other form of intimidation, and with wrongful intent, of an aircraft within the special aircraft jurisdiction of the United States.

    "(3) An attempt to commit aircraft piracy shall be within the special aircraft jurisdiction of the United States even though the aircraft is not in flight at the time of such attempt if the aircraft would have been within the special aircraft jurisdiction of the Unit-

    ed States had the offense of aircraft piracy been completed."

2. The facts surrounding the hijack itself need not be stated here; they are reviewed at length in *United States v. Green*, 373 F.Supp. 149, 150–51 (E.D.Pa.), aff'd, 505 F.2d 731 (3d Cir. 1974). A more detailed statement of the facts pertinent to this appeal appears in the trial court's comprehensive opinion. *United States v. Tesfa*, 404 F.Supp. 1259, 1261–65 (E.D.Pa. 1975).

3. The Springfield staff concluded by December 1972 that defendant was competent to stand trial and to understand the proceedings against him and he was discharged from Springfield and returned to Philadelphia for trial at that time. .

4. At the defendant's trial in November 1974, Levitt appeared as a prosecution expert; his qualifications as an expert are challenged by defendant on this appeal. See note 19 *infra*.

that he was competent. On October 15, 1974, the trial judge began another pre-trial competency hearing. In a pre-trial competency determination in October 1974, Dr. Eardley again acted as the court's appointed expert under the provisions of 18 U.S.C. § 4244 (1970),[5] examined the defendant at Philadelphia on October 16, and testified that defendant was competent to stand trial; his testimony before the district court is challenged by defense counsel on this appeal (pages 29ff. and 41 & 42 of defendant's brief). In response to questions from the court, defense counsel stated that he was able to communicate with Tesfa.[6] The trial judge again found defendant competent (404 F.Supp. at 1263) and commenced the process of selecting a jury, after conducting a suppression hearing on October 17–18.

During the period of jury selection, the defendant behaved strangely in and out of the court room.[7] On October 23, 1974, the

**5.** Section 4244 provides, *inter alia:*

"Whenever after arrest and prior to the imposition of sentence or prior to the expiration of any period of probation the United States Attorney has reasonable cause to believe that a person charged with an offense against the United States may be presently insane or otherwise so mentally incompetent as to be unable to understand the proceedings against him or properly to assist in his own defense, he shall file a motion for a judicial determination of such mental competency of the accused, setting forth the ground for such belief with the trial court in which proceedings are pending. Upon such a motion or upon a similar motion in behalf of the accused, or upon its own motion, the court shall cause the accused, whether or not previously admitted to bail, to be examined as to his mental condition by at least one qualified psychiatrist, who shall report to the court. For the purpose of the examination the court may order the accused committed for such reasonable period as the court may determine to a suitable hospital or other facility to be designated by the court. If the report of the psychiatrist indicates a state of present insanity or such mental incompetency in the accused, the court shall hold a hearing, upon due notice, at which evidence as to the mental condition of the accused may be submitted, including that of the reporting psychiatrist, and make a finding with respect thereto. . . ."

At this time, Dr. Taub, a psychologist, also examined defendant, concurred in Dr. Eardley's opinion as to Tesfa's competency to stand trial, and stated that the pressure and tension of the trial would cause defendant's mental condition to deteriorate "no more than for any ordinary person." 404 F.Supp. at 1263. There was conflicting testimony as to the effect of the pressure of trial on the defendant's mental state.

**6.** The trial court's colloquy with defense counsel on October 16, 1974, was as follows (119a):

"THE COURT: . . . when you talked with him, does he seem to understand what you say when he talks with you, are his responses appropriate to the questions that you ask?

"MR. LERNER: I would say so.

"THE COURT: In your opinion is he competent to stand trial?

"MR. LERNER: I would rather answer the question this way, Your Honor, by saying that I have not experienced any difficulty in communicating with my client, in explaining things to him and obtaining information from him over the last month or so. There have been occasions where there were apparent memory lapses but I think they are attributable to the fact that we are talking about some finite events several years ago.

"That's all."

**7.** The transcript of the jury selection process contains this language at pages 201–03 (Doc. 218, E.D.Pa., Crim. No. 72–425):

"THE COURT: . . . This morning, shortly after 9 o'clock . . . [the] Chief Deputy United States Marshal contacted me and told me that Mr. Tesfa had collapsed at the Detention Center when he was approached by the United States Marshal this morning to be brought down here to the courthouse.

"Mr. Vinci said as the matter was reported to him that Mr. Tesfa in effect had fainted but as described to Mr. Vinci in falling down Mr. Tesfa had been very careful that his head did not strike the ground and had in effect lowered his head into a reclining position.

"Shortly thereafter, as reported in a later conversation, Mr. Tesfa regained his feet and was walking around and was in an adjacent or nearby part of the Detention Center when again he collapsed, this time into the arms of one of the prison personnel. A guard, I believe.

"Mr. Tesfa was then transported to Nazareth Hospital at the direction of the Detention Center. I gather that nothing was found at the Nazareth Hospital because he was then returned to the Detention Center and the precise time of his return is a matter about which I am not certain but I would think sometime around 11:00 or 11:15 this morning.

.    .    .    .    .

"At about 12:15 Mr. Smith and Mr. Vinci came to me and said that when the vehicle had gone to pick up Mr. Tesfa that he refused

trial judge telephoned Dr. Eardley to report the defendant's behavior to him and to ascertain if this behavior in any way altered Dr. Eardley's earlier conclusion that the defendant was competent but malingering. Defense counsel was not present at nor a party to the call; however, the reasons for the call, the conversation which transpired, and Dr. Eardley's response were discussed by the trial judge in open court with defense counsel. No objection to the call was made by counsel at the time of this discussion.[8]

At the completion of the jury selection process, on October 29, 1974, the court held another hearing on the issue of Tesfa's competency. Dr. Eardley testified in open court as the court's expert. On the day of his testimony, the court had allowed him an opportunity to review in chambers the record of the defendant's behavior during the period of jury selection;[9] the defendant

to get into the vehicle, that he had resisted the attempts by the marshals to place him in the vehicle and while no doubt he could have been placed in the vehicle by force it would in all probability take force to get him into the vehicle and Mr. Smith and Mr. Vinci felt it would take force in order to get Mr. Tesfa from wherever the vehicle was unloaded here in the courthouse up to the third floor where we presently are sitting.

"I directed Mr. Smith and Mr. Vinci not to make that effort. . . .

.    .    .    .    .

"[U.S. ATTORNEY]: I am not sure Your Honor told me but I know through Mr. Vinci that last night Mr. Tesfa collapsed or had to be carried from the courthouse and I understand the carrying process was carrying him from the cell block or some area to the cell block down the stairs to the vehicle to take him back to the Detention Center.

"THE COURT: That was also reported to me and I forgot to mention it."

8. The trial record of October 23, 1974, contains this wording (N.T. 208–09):

"THE COURT: . . . The other thing that I did this morning after I initially talked with Mr. Vinci was to talk with Dr. Eardley. I told Dr. Eardley of the incident in court yesterday or how Mr. Tesfa appeared in court yesterday. I told Dr. Eardley of the report I had received from Mr. Vinci about Mr. Tesfa collapsing and the way he made sure that his head didn't bang the ground. I told Dr. Eardley of the way Mr. Tesfa jumped up when I mentioned his name as I came into the courtroom yesterday and Dr. Eardley said that, as I reported it to him, there was nothing that would in any way change his mind about the findings that he made originally and has continued to make that Mr. Tesfa is competent. In other words, none of the conduct which I reported to Dr. Eardley affected the findings that he made and didn't make him change his mind as of the time that he was talking with me.

"For the record, I also conclude that there is nothing that has been reported to me about Mr. Tesfa's conduct, nothing that I observed yesterday, nothing about Mr. Tesfa's appearance or the way he was staring off into space or looking intently at the ceiling which in any way affects my belief that Mr. Tesfa is competent.

"I felt yesterday that Mr. Tesfa responded when his mother was present. I saw him talking with her. It was reported to me that Mr. Tesfa talked with the marshals in a normal way when he was not aware that he was being observed and I conclude that Mr. Tesfa is still competent and that the trial is to go on. However, I have asked Mr. Lerner if he will please go out to the Detention Center to talk with Mr. Tesfa and then contact me later this afternoon and if Mr. Tesfa's mother is available to take her with you, although I haven't seen her.

"Now is there anything else that you would like to add, Mr. Undercofler?

"MR. UNDERCOFLER: No, Your Honor.

"THE COURT: Is there anything you would like to add, Mr. Lerner?

"MR. LERNER: Off the record.

"(Discussion was had off the record.)"

On appeal, defendant contends that this phone call deprived him of his right to a full and open hearing on the issue of Tesfa's competency to stand trial.

9. The trial record of October 29, 1974, contains this wording at pages 719–21:

"ROBERT JACK EARDLEY, SWORN.
BY THE COURT:

"Q. Dr. Eardley, you are the same Dr. Eardley, are you not, who testified in these proceedings on October 15 and October 16?

"A. Yes, sir.

"Q. At that time it is my recollection that on October 16 you testified that in your opinion Mr. Tesfa was competent to stand trial?

"A. Yes, sir.

"Q. Dr. Eardley, I would now like to show you portions of the record from the proceedings in this case, specifically October 22, 23, 24, and 25.

"You will note there are penciled notations on the cover of each of these dates, for example, on October 22 there is a reference to Page 9, Page 138, Pages 182 to 187.

"As far as October 23 is concerned, there is a reference to Pages 201 and 210.

contends that this opportunity for review also served to deny him the due process right of a full and open hearing and that it revealed a predisposition by the court to find that the defendant was competent. Dr. Eardley re-examined the defendant on October 29, along with Lois Briggs, a consulting psychologist at Springfield, who first interviewed Tesfa in August 1973. These two experts concluded that he was competent and disagreed with the conclusions of the privately retained defense expert, Dr. Gerald Cooke. Although by this time a consultant for the prosecution, Mr. Levitt, was called as a witness by the defense, his conclusions as to the defendant's competency supported those of Dr. Eardley.

Trial recommenced on October 30, 1974, continuing without any further competency hearings until November 21, 1974, when, after two hours and 55 minutes of deliberation, the jury returned a verdict of guilty on both counts of the indictment (see page 2 above).

At intervals, throughout the course of the trial, it was reported to the court that the defendant was not communicating with defense counsel or assisting in the presentation of his defense.[10] However, it was also reported to the court that when out of the view of the prosecutor, his counsel, the jury and the trial judge, the defendant's behavior was substantially different from the appearances of mental impairment he gave in the presence of the above-listed persons.[11] On November 22, 1974, at a post-trial competency hearing, the trial judge revealed that from October 30 he had maintained careful notes of the defendant's behavior in the court room and had directed his law clerks to observe and record the defendant's actions when the defendant was outside of his observation.[12] Each law clerk testified to observations consistent with an affected pose of mental impairment at times, including staring into space, looking at his fingers, holding them up and moving them around, laughing at inappropriate times, staring at people, etc. N.T. 15–30 [13] (Doc.

---

> "As far as October 24 is concerned, there are references to Page 215 to 221, Pages 246, 367, 369 to 374, 377 to 380.
>
> "As far as October 25 is concerned, there are references to Pages 494 to 495, 496 to 501, 620 to 622.
>
> "You have been waiting up in my chambers for a period of time. During that period of time did you have an opportunity to look at those pages that I have just referred to in the record?
>
> "A. Yes, sir.
>
> "Q. You previously indicated an opinion on October 16 that Mr. Tesfa is competent to stand trial. I have now brought to your attention these matters in the record and also you have had an opportunity to talk to Mr. Tesfa today. As a result of your previous knowledge of Mr. Tesfa, your previous examinations, what you know about him, the psychological testing plus the additional information that you have there in the record for October 22, 23, 24, and 25, plus your examination today, have you changed your opinion as to whether or not Mr. Tesfa is competent to stand trial?
>
> "A. No, sir."

10. *E. g.*, N.T. 284–85, 512–15.

11. *Id.*

12. This action by the trial judge is also challenged here as constituting a denial of a fair hearing, but no objection was raised in the

district court. The trial court advised defense counsel on November 5, 1974, that the defendant's behavior was being monitored. *See* N.T. 515. *See also* N.T. 1146, Nov. 12, 1974. Two defense experts, Dr. Robert J. Murney and Dr. Robert L. Sadoff, also conceded that a possibility existed that the defendant possessed the capacity "to successfully fake bad" the psychiatric tests administered to him. Both felt, however, that he could not do this consistently over a period of time. See, *e. g.*, N.T. 960–61, 1258–60. While at trial this testimony properly went to the question of the defendant's sanity at the time of the hijacking, the testimony supports the propriety of the actions taken by the court in determining the defendant's competency.

13. At the close of the law clerks' testimony on November 22, 1974, defense counsel stated that he could not communicate effectively with the defendant during the course of the trial. N.T. 30–33 (Doc. 212, Crim. No. 72–425, E.D.Pa.). Following this, the trial judge reviewed all pertinent portions of the record with Dr. Eardley (N.T. 34–36), who again concluded that the defendant was competent, after reviewing his interviews with defendant on November 21 & 22 and his evaluation of defendant's condition in the past and at that time (N.T. 37–45), using, *inter alia*, this language at N.T. 44–45 and N.T. 48:

> "As I have stated, I have known Mr. Tesfa for a long period of time. There have been

212, Crim. No. 72–425, E.D.Pa.). However, when the above-listed persons were not present, "Mr. Tesfa perked up and went to talk to his mother and talked to the marshals, got a cigarette from them and acted in a rather normal manner, seemed to easily communicate with them . . . and when the attorneys and Your Honor came back in he resumed his staring during the jury selection." Also, the defendant appeared to pay close attention to the expert testimony presented by both sides (e. g., N.T. 16, 19–21).

Further post-trial testimony concerning the defendant's competency was taken on November 22 (the day after return of the guilty verdict), December 3 and 10, 1974, Dr. Eardley testified during the course of these post-trial hearings, as did the defendant's privately retained experts, Dr. Cooke and Dr. Robert L. Sadoff, who had testified for the defendant in February 1973 and at trial. At the conclusion of the proceeding on December 10, 1974, defense counsel suggested for the first time that the trial judge's opinion of the defendant's competency was fixed and thus a different, independent expert should be appointed by the court to review the relevant testimony (pages 273–78 of Doc. 214, Crim. No. 72–425, E.D.Pa.). The court rejected this suggestion, but invited defense counsel to submit any additional evidence that he cared to provide. Nothing further was ever offered.

## I. COMPETENCE OF THE DEFENDANT TO STAND TRIAL [14]

A. *Alleged prejudgment by the district court of defendant's competency to stand trial*

■ For the first time the defendant, through his counsel, orally argued to this court that the trial judge denied him the fair trial mandated by the due process clause of the Fifth Amendment because he prejudged the issue of defendant's competency to stand trial through excessive reliance on the testimony of Dr. Eardley.[15]

---

some diversity of opinions in regard to Mr. Tesfa. And there have been some indications perhaps that he was delusional, maybe another diagnosis involved.

"It would be very easy for me to accept his behavior as psychotic behavior and just let it go at that. However, when I look at the whole picture over a two-year period—for example, Mr. Tesfa on one occasion had no story in relation to his difficulties. He then had an ethnic cultural shock story and then a delusional story. So in this case it is certainly very open to question. I don't like to disagree with my psychiatric colleagues in any area because I may be wrong myself and I try to look into the situation but in my experiences from the numerous number of individuals that I saw, and I have seen in the past, that I did not see what I called a thought disorder in Mr. Tesfa. In view of that I see no reason to change my previous standing of competency and then based upon my findings yesterday and today I still find that I consider Mr. Tesfa competent.

. . . . .

"In view of this material I stated here, he is attempting to cope with the situation, I don't believe that I have ever seen Mr. Tesfa in a psychotic situation. I felt that he was competent in the past. I have always considered him competent."

14. The record and pertinent cases concerning this issue are set forth in *United States v. Tesfa, supra* note 2, at 1261–70 of 404 F.Supp.,

which has been of great assistance to this court.

15. This contention appears to be that the trial judge had determined to adopt the 1972 opinion of Dr. Eardley that defendant was malingering and did not consider subsequent testimony given concerning defendant's mental and emotional condition. It is contained in this language of defense counsel at the oral argument:

"Your Honors, there is a difference between what due process requires and what 4244 requires, or there may be in certain cases, and I think this is such a case. Due process requires a fair hearing and one of the most fundamental elements of a fair hearing is separation of the prosecution or marshalling of the evidence from the adjudication. In this case the court had made a decision way back when—that is at the time of the first competency hearing—despite all the evidence, which I think was overwhelming, which I think the record shows was overwhelming, that the defendant was incompetent, chose to believe Dr. Eardley and in this court's opinion in this case that states that as early as October 1972 Dr. Eardley had concluded that the defendant was malingering. Thereafter, Your Honors, every time that the question came up, with one exception, that was the exception when the court appointed the doctors at Holmesburg who found the defendant incompetent, every time after that,

After a careful review of the record, we have concluded that the evidence fully justified the conclusion of the trial judge that the defendant was mentally competent to understand the proceedings against him and to assist his counsel in his defense, had he so desired, during (a) the selection of the jury, (b) his trial in October-November 1974, and (c) at the time of his sentencing in December 1974. See *United States v. Tesfa,* *supra,* at 1261–70 of 404 F.Supp.

## B. *The impartiality of Judge Ditter and Dr. Eardley*

In *United States v. Pogany, supra,* Judge Hunter pointed out at page 77:

"Congress through Section 4244 has assured an accused that if his mental capacity to cope with the complexities of trial is in doubt, there will be a judicial determination of that issue. If made in good faith and not patently frivolous a Section 4244 motion requesting a psychiatric examination must be granted. [Citing cases.] Section 4244 provides that where the psychiatric report indicates a present state of mental incompetence, a hearing *must* be conducted for judicial determination of that issue. In applying § 4244, an accused is considered to have the mental capacity to stand trial if he 'has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him.' *Dusky v. United States,* 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960)." (Footnote omitted.)

See also *Drope v. Missouri,* 420 U.S. 162, 171–73, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975). The determination of a defendant's competency to stand trial must be that of the trial judge. A finding of whether a defendant is competent or not within the meaning of 18 U.S.C. § 4244 is a finding of fact by the trial court which may not be set aside on review unless it is clearly erroneous. See *Krasnov v. Dinan,* 465 F.2d 1298, 1299–1300 (3d Cir. 1972); *United States v. Gray,* 421 F.2d 316, 317 (5th Cir. 1970).

To aid the court in its determination, the inherent power of a trial judge to appoint an expert of his own choosing is clear. See F.R.Evid. § 706 and Advisory Committee Note, and authorities cited therein; see also 1 Pt. 2 Moore's Federal Practice, Pt. 3.40 (2d ed. 1975); 8 Moore's Federal Practice—Criminal Rules ¶ 28.01 (2d ed. 1975); 9 J. Wigmore, Evidence § 2484, p. 270 (3d ed. 1940). In *Pogany, supra* at 78, Judge Hunter pointed out that the impartial expert is the court's witness, rather than a prosecution or defense witness.

In this case, with its repetitive competency hearings, numerous psychiatric examinations and tests, many medical experts, and supplementary expert opinions, the court's appointed expert, of necessity, had to possess a long familiarity with the defendant and his mental history. Under these circumstances, we reject defense counsel's contention on December 10 that the trial judge should have appointed a master to evaluate all of the expert testimony in this case and, in effect, adjudicate the competency issue. We find no abuse of discretion in the district court's selection and retention of Dr. Eardley as an expert. Any bias or predisposition of Dr. Eardley to adhere improperly to his early conclusion that the defendant was competent could have been demonstrated by the defense on cross-examination, as ample opportunity existed to do so. The trial judge's finding that the defendant was incompetent in May 1973 demonstrates that his mind remained open to find for the

despite the wealth of talent here, despite the record that Dr. Eardley had made of his evaluation and his contact, the presence of all of the records, the court went to the phone ex parte on two occasions, called Dr. Eardley from wherever he was out in the mid-west, or out in the far west, come here, see the defendant for 20 minutes, a half an hour, an hour, and give me an evaluation. I think,

Your Honors, what we have here on this record is perhaps the appearance of fairness, which the courts require, but not fairness. The court knew in advance what Dr. Eardley's position was. The court had stated, and it appears myriad of times throughout the record, that the court agreed with Dr. Eardley. It is my view, Judge Ditter says, that this defendant is an actor."

defendant when the evidence raised a sufficient doubt about the defendant's ability to stand trial. Clearly, the trial judge was entitled to reject the conclusions proffered by the defense's experts and rely on the testimony of Dr. Eardley and his own perceptions. The district court opinion outlines compelling reasons for its competency determinations. That court's appointment of Dr. Eardley and its consequent findings satisfy the *Dusky* and *Pogany* standards in every respect.

## C. The ex parte communications with Dr. Eardley and the law clerks

We have concluded that under the circumstances of the present case it was not reversible error for the trial judge to conduct an ex parte telephone conversation with Dr. Eardley on October 23,[16] or to instruct his law clerks to monitor the defendant's behavior when out of the presence of the persons listed above at page 8. First, the call occurred with seven days of a psychiatric examination and a full due process hearing wherein the defendant was adjudged competent to stand trial. We note that in that hearing defense counsel stated he was able to communicate effectively

with the defendant. Second, at the completion of empanelling the jury, on October 29 another competency hearing was held in which the defense was afforded a full opportunity to cross-examine Dr. Eardley concerning the telephone call and his direct testimony, as well as to present its own countervailing evidence. In view of the opportunity given Dr. Eardley by the court to review, and thus familiarize himself with, the record outlining the defendant's in-court behavior and the doctor's availability to defense counsel for cross-examination on October 29, there was no violation of due process of law in the procedure used. See 5 Wigmore, Evidence § 1385a, pp. 87–88 (Chadbourn rev. 1974). The contacts of Dr. Eardley with the trial judge on October 23 and October 29 were not clandestine but were put on the record by the court; and full opportunity existed for cross-examination. Under these circumstances, we have concluded that there was no deprivation of due process of law. Finally, we think that the trial judge's actions in recording the defendant's actions and in instructing his law clerks to do so comports with these standards outlined in *United States v. Liddy*, 166 U.S.App.D.C. 95, 509 F.2d 428, 438 (1974):

for all parties may participate. As stated in *The Economist In Chambers and In Court, supra* at 57–58 and 63 of 12 ABA Antitrust Section:

". . . objectivity is not enough. If the opinion of the expert is to help the judge, it must favor one party or the other . . . since [the Eighteenth Century] it has been recognized that the responsibilities and training of . . . experts are not adequate substitutes for the safeguards of adversary procedure.

.      .      .      .      .

"The use of the neutral expert . . . appears to be more in harmony with traditional procedure than any other."

However, the presence of counsel in person, or through participation in a conference call, assures that the expert will not inadvertently rely on some mistaken, supposed factual material which is not in evidence. This result is only one of the advantages of the presence of counsel. Having counsel present during all communications is consistent with the adversary system's reliance on the efforts of opposing counsel, representing differing viewpoints, to secure the most accurate results throughout the trial.

---

**16.** We note that every *ex parte* communication to the trial court does not require reversal, especially when there has been a subsequent opportunity to cross-examine the declarant concerning such communication and a failure to object at trial to the procedure used. See *United States ex rel. Stukes v. Shovlin*, 464 F.2d 1211, 1214 (3d Cir. 1972). Generally, however, the court should avoid *ex parte* communications with anyone associated with the trial, even its own appointed expert. See ABA Standards for Criminal Justice, The Function of the Trial Judge, § 1.6 & Commentary at 34 (1972); B. Webster, *The Use of Economic Experts as Witnesses in Antitrust Litigation*, Third Circuit Judicial Conference, 32 F.R.D. 67, 102–03 & 106 (1962); B. Webster & W. Hogeland, *The Economist In Chambers and In Court*, 12 ABA Antitrust Section 50, 57–63 (1958); A. Matthews, *Mental Disability and the Criminal Law*, 83–89, 96 (1970).

Although we find no reversible error here, when the necessity arises for the court to talk with an expert appointed pursuant to 18 U.S.C. § 4244, a proper way would be to utilize an on-the-record conference in chambers or an on-the-record conference call so that counsel

"The precepts of fair trial and judicial objectivity do not require a judge to be inert. The trial judge is properly governed by the interest of justice and truth, and is not compelled to act as if he were merely presiding at a sporting match. He is not a 'mere moderator.' As Justice Frankfurter put it, '[f]ederal judges are not referees at prize-fights but functionaries of justice.' *Johnson v. United States*, 333 U.S. 46, 54, 68 S.Ct. 391, 395, 92 L.Ed. 468 (1948) (dissenting in part). A federal trial judge has inherent authority not only to comment on the evidence adduced by counsel, but also—in appropriate instances—to call or recall and question witnesses. He may do this when he believes the additional testimony will be helpful to the jurors in ascertaining the truth and discharging their fact-finding function, what is required, however, are reins of restraint, that he not comport himself in such a way as to 'tilt' or oversteer the jury or control their deliberations.

"Applying these general principles to this particular case, we conclude that, although certain problems are presented by the action of the trial judge in reading to the jury from the testimony first taken from Sloan outside the jury's presence, his overall course was neither an abuse of his judicial function nor a denial of fair trial."

(Footnotes omitted.)

Both Judge Ditter and his clerks placed their observations on the record and, once again, the defense was afforded a full opportunity to cross-examine them or to offer additional evidence of his own that would explain the wide variations in the defendant's behavior.

## II. THE COURT'S INTERROGATION OF DEFENSE WITNESSES

The authority of a federal trial judge to question witnesses is well established. See, *e. g.*, F.R.Evid. § 614(b) & Advisory Committee's Note (28 U.S.C.A. page 435) and authorities cited therein, where it is said: " . . . the manner in which interrogation should be conducted and the proper extent of its exercise are not susceptible of formulation in a rule." Our examination of the record has convinced us that the trial judge did not abandon his proper role and assume that of an advocate and that there was no prejudicial error. See, for example, *Groce v. Seder*, 267 F.2d 352, 355 (3d Cir. 1959).

In the margin we cite those portions of the trial court's interrogation or comments which the defense has pointed out to us [17] as prejudicing defense witnesses or demonstrating the court's hostility.[18] We have concluded that the trial court's questions in this case did not constitute reversible error under the terms of the standard laid down in *Groce, supra*. The instant case lasted through 16 days of trial plus additional periods of jury selection, instruction and deliberation. Unlike the cases relied on by defendant at page 55 of his brief, the few examples of questioning by the trial judge in this case do not reveal the pervasive, and thus improper, intrusion described in those cases. See *United States v. Liddy*, 166 U.S. App.D.C. 95, 509 F.2d 428, 439–41 (1974). In addition, we recognize that one gauge of the degree of proper court intrusion is the complexity of the facts and the trial judge's long familiarity with them; certainly, in this case, his broad and long-term familiarity with the defendant's mental and emotional condition, as well as the procedural background, would have justified question-

**17.** Counsel has referred us to the following instances of alleged improper questioning or comment by the trial judge in a trial lasting 16 days:

(1) Testimony of Dr. Nicholas Godfroy at N.T. 1088 (N.T. 1084–88) and N.T. 1161–62 (N.T. 1115–34, 1147–62).

(2) Testimony of Colonel Tesfa Desta at N.T. 1322–25 (alleged objectionable purpose recited at page 58 of defense brief).

(3) Testimony of Lawanda Mayhew at N.T. 1384–88 (objection at N.T. 1384–86 complied with by the court).

(4) Surrebuttal testimony of Dr. Robert J. Murney at N.T. 2023 and 2033–34 (objection recited at pages 57–58 of defense brief).

**18.** The defendant's brief presents this contention in the first full paragraph on page 58 and note 16 on that page.

ing to an extent greater than that which actually occurred. Finally, we note that on the two occasions when defense counsel made timely objections to the court's questions, the court withdrew the questions and refrained from further questioning of that witness. See references to testimony of Godfroy and Mayhew at note 17 above. We have no reason to believe that the court would not have similarly refrained from its interrogation if objection had been made on those other occasions of which complaint is now made. See *Barba-Reyes v. United States*, 387 F.2d 91 (9th Cir. 1967). Also, we hold that the court's questions or comments, when considered either separately or all together, do not rise to the level of fundamental error. See F.R.Crim.P. 52(b); 8A Moore's Federal Practice—Criminal Rules ¶ 52.02[2], *et seq.* (2d ed. 1975).

We have considered the other contentions [19] raised by the defendant and find them to be without merit.

For the foregoing reasons, the judgment of the district court will be affirmed.

---

19. These contentions include the following:

1. Appellant was not competent to stand trial during at least some portions of the trial.
a. The Government has the burden of proving appellant competent to stand trial beyond a reasonable doubt. See *United States v. Tesfa*, 404 F.Supp. 1259, 1268 (E.D.Pa.1975).
b. The overwhelming weight of the evidence established that appellant was not competent to stand trial during at least part of the trial. See Appendix, Vol. 1, p. 17, and N.T. 59–60, Vol. 10, pp. 157 & 1926–31, Vol. 6, pp. 835–37; *United States v. Tesfa, supra* at 1268–70 of 404 F.Supp.
2. The voir dire conducted by the court prevented the striking of a fair and impartial jury.
a. In general.
b. The court erroneously and prejudicially refused to strike venireman Paul Koch for

cause. See *United States v. Tesfa, supra* at 1271–73 of 404 F.Supp.
3. The court erred in permitting the Government's psychologist Albert Levitt to testify as an expert with regard to appellant's sanity. See *United States v. Tesfa, supra* at 1273–74 of 404 F.Supp.
4. The court erred in refusing to give appellant's requested jury instruction (No. 7), and in the instruction it gave with respect to the effect on the appellant of a verdict of not guilty by reason of insanity. See *United States v. Alvarez*, 519 F.2d 1036, 1047–48 (3d Cir. 1975).
5. As a matter of law, there was reasonable doubt as to appellant's sanity at the time of the crime. See *United States v. DeCavalcante*, 440 F.2d 1264, 1273 (3d Cir. 1971).