**G.K. LAS VEGAS LIMITED PARTNERSHIP and Sheldon Gordon, Plaintiffs,**

v.

**SIMON PROPERTY GROUP, INC., et al., Defendants.**

**No. CV–S–04–1199 DAE–GWF.**

United States District Court, D. Nevada.

Nov. 30, 2009.

Ann M. Galvani, David Boies, Richard E. Weill, Robert B. Silver, Christopher M. Green, Boies Schiller & Flexner, LLP, Armonk, NY, Boris E. Ayala, Carter H. Burwell, Eric B. Halper, Michael P. Carroll, Patrick A. Bradford, Steven Berrent, Crystal McKellar, Davis Polk & Wardwell, New York, NY, Richard J. Pocker, Douglass A. Mitchell, Boies Schiller & Flexner, LLP, Las Vegas, NV, Timothy B. Fitzgerald, G.K. Las Vegas, LP, Greenwich, CT, for Plaintiffs.

C. Keith Rooker, Michael D. Rawlins, Kevin E. Beck, Rooker Rawlins, Henderson, NV, Dennis C. Brown, George M. Garvey, James C. Rutten, Eric J. Lorenzini, Marcus J. Spiegel, Munger, Tolles & Olson LLP, Los Angeles, CA, Christopher D. Moore, Anthony S. Fiotto, Goodwin Procter LLP, Boston, MA, Kirk B. Lenhard, Jones Vargas, Las Vegas, NV, for Defendants.

*ORDER:(1) ADOPTING THE MAGISTRATE JUDGE'S FINDINGS AND RECOMMENDATIONS ON THE MOTIONS REGARDING FORENSIC EXAMINATIONS; (2) DENYING WITH PREJUDICE DEFENDANTS' SECOND EMERGENCY MOTION; (3) GRANTING PLAINTIFFS' COUNTER MOTION; (4) VACATING THIS COURT'S FORENSIC EXAMINATIONS ORDER; AND (5) MODIFYING THIS COURT'S SPOILATION ORDER TO DENY WITH PREJUDICE DEFENDANTS' MOTION FOR DISMISSAL OF CLAIMS AND MONETARY SANCTIONS BASED ON SPOILATION*

DAVID ALAN EZRA, District Judge.

Pursuant to Local Rule IB 3–1, the Court finds this matter suitable for disposition without a hearing. After reviewing Defendants' Objections to the Magistrate Judge's Findings and Recommendations,

Defendants' Second Emergency Motion to Enforce Orders Regarding Forensic Examinations, Plaintiffs' Counter Motion to Vacate, and the supporting and opposing memoranda, the Court hereby: (1) **Adopts** the Magistrate Judge's Findings and Recommendations on the Motions Regarding Forensic Examinations (Doc. # 468); (2) **Denies with prejudice** Defendants' Second Emergency Motion (Doc. # 451); (3) **Grants** Plaintiffs' Counter motion (Doc. # 453); (4) **Vacates** this Court's May 14, 2009 Order Regarding Forensic Examinations of Computer Equipment (Doc. # 449); and (5) **Modifies** this Court's March 9, 2009 Order to deny with prejudice Defendants' motion for dismissal of claims and monetary sanctions. (Doc. # 437.)

## BACKGROUND

The parties are familiar with the facts of this case, and therefore the Court recites the background facts only as is necessary for a decision on the Objection to the Magistrate Judge's Findings and Recommendation ("F & R"). (Doc. # 468.) Additional background facts are contained in the F & R.

This action stems from a partnership formed between G.K. Las Vegas' managing partner, Gordon Group Holdings, Ltd. ("Gordon"), and Simon Property Group ("Simon"). On February 6, 1990, the parties created the Forum Developers Limited Partnership ("FDLP") to develop and manage the Forum Shops, a Las Vegas Strip shopping complex adjacent to Caesars Palace. The FDLP partnership agreement included a buy-sell provision, under which the parties had the right to tender an all-cash price to purchase or, in the alternative, sell their pro rata interest in FDLP.

In 1998, Gordon sought to invoke the buy-sell provision and sought financial backing from Starwood Capital Group LLC ("Starwood"). Gordon and Starwood entered into an agreement under which Gordon would have to pay Starwood a "break-up" fee if Gordon were unable to trigger the buy-sell.

In 1999, Hanna Struever, Gordon Vice President of Leasing, left the Gordon organization. Sometime after her departure, her email files were "expunged."

In 2001, Gordon switched to a new network server to house all of the electronic data. The network server that had been in use up to 2001 (the "2001 Server") was removed and all files were transferred onto the new server (the "New Server").

In September 2001, Randall Brant, partner and President of the Gordon organization left the company. Brant had been heavily involved in, among other things, the proposed joint venture between Gordon and Starwood. Brant executed the Gordon–Starwood agreement under which Gordon was later forced to pay Starwood a $2.5 million break-up fee after Simon allegedly violated the provision of Simon's agreement to allow Starwood to conduct an audit of FDLP books. Sometime after Brant's departure, his email files were expunged.

In August 2003, after the buy-sell transaction closed, Gordon's IT vendor, Computronix, Inc., cleaned all the data off of the laptop of Scott Gordon. Scott Gordon had been President of Gordon from 2001 to Fall 2007 and had been involved in the buy-sell transaction of FDLP.

Sometime in 2006, after the original complaint in this action had been filed on August 27, 2004, Gordon discarded the 2001 Server. The data was erased from the drives.

On January 10, 2008, Gordon filed its Third Amended Complaint. (Doc. # 279.) This included claims of racketeering,

fraud, breach of fiduciary duty, breach of contract, various torts, accounting, unjust enrichment, federal securities law violations, and rescission.

On December 1, 2008, Defendants filed a motion seeking, *inter alia,* dismissal and monetary sanctions based on Plaintiffs' alleged spoilation of evidence ("Spoilation Motion"). (Doc. # 399.) In that motion, Defendants argued that "Plaintiffs' production of electronic documents, especially their production of emails from key employees, has been astoundingly deficient." (*Id.* at 1.) Defendants stated that Plaintiffs produced only four emails from Scott Gordon's files, three emails from Brant's files, and none from Struever's files. (*Id.*)

In an Order filed March 9, 2009 (the "Spoilation Order") following a February 23, 2009 hearing (the "Spoilation Hearing"), the Court found that Simon could not demonstrate at that time that Scott Gordon, Struever, and Brant's emails had indeed been completely destroyed such that they were wholly unavailable to the parties. (Doc. # 437 at 15–16.) Defendants' motion was denied without prejudice.

In an Order filed May 14, 2009, (the "Forensic Examinations Order"), the Court ordered that FTI Consulting ("FTI") conduct forensic examinations of computer equipment used by Scott Gordon, the New Server, and the Atlantic City server. (Doc. # 449.) The Court further ordered that the parties cooperate in good faith in carrying out the terms of the order.

On June 18, 2009, Defendants filed a Second Emergency Motion to Enforce Orders Regarding Forensic Examinations.[1] (Doc. # 451.) On June 23, 2009, Plaintiffs filed a Response to the Second Emergency Motion. (Doc. # 452.) On the same day, Plaintiffs filed a Counter Motion to Vacate the Court's May 14, 2009 Order, Modify Court's March 9, 2009 order, and Related Relief. (Doc. # 453.) On June 26, 2009, Defendants filed a Reply in support of their Second Emergency Motion, (Doc. # 456), and Opposition to Plaintiffs' Counter Motion, (Doc. # 457). On June 30, 2009, Plaintiff filed a Reply in support of their Counter Motion. (Doc. # 460.)

On August 11, 2009, Magistrate Judge George Foley issued an F & R on the above-listed Motions Regarding Forensic Examinations. (Doc. # 468.) Magistrate Judge Foley recommended that Defendants' Second Emergency Motion be denied, that Plaintiffs' Counter Motion be granted, and left it to this Court to determine whether the March 9, 2009 Order should be modified to deny Defendants' Spoilation Motion with prejudice.

On August 27, 2009, Institutional Defendants (the Simon Property Group) filed an Objection to Magistrate Judge's F & R. (Doc. # 477.) On the same day, Individual Defendants David Simon, Herbert Simon, and Melvin Simon joined in that objection and also objected on additional grounds.[2] (Doc. # 476.) On September 11, 2009, Plaintiffs filed their Opposition. (Doc. # 478.) On September 23, 2009, the Court issued an order granting Defendants' request to file reply briefs in support of their objections.[3]

---

1. On July 15, 2009, Defendants filed a Notice of Withdrawal, and withdrew their portion of the Second Emergency Motion requesting that the server be made available for re-imaging. (Doc. # 465.)

2. Because the Individual Defendants have joined in Institutional Defendants' Objection,

this Court will refer to the group collectively as "Defendants" throughout this Order.

3. Defendants did not formally file Replies. In their motions for leave to file reply briefs, however, Defendants submitted proposed reply briefs, and the Court granted Defendants

## STANDARD OF REVIEW

Local Rule IB 3–1 provides that "[a] district judge may reconsider any pretrial matter referred to a magistrate judge in a civil ... case ... where it has been shown that the magistrate judge's ruling is clearly erroneous or contrary to law." LR IB 3–1. "The district judge in the case must consider timely objections and modify or set aside any part of the order that is clearly erroneous or contrary to law." Fed.R.Civ.P. 72(a).

The "clearly erroneous" standard applies to the Magistrate Judge's factual findings while the "contrary to law" standard applies to the Magistrate Judge's legal conclusions. *Grimes v. City and County of San Francisco*, 951 F.2d 236, 240 (9th Cir.1991). A factual finding is clearly erroneous if the reviewing court is left with "a definite and firm conviction that a mistake has been committed." *Burdick v. C.I.R.*, 979 F.2d 1369, 1370 (9th Cir.1992). Under the contrary to law standard, the Court conducts a *de novo* review of the Magistrate Judge's legal conclusions. *Grimes*, 951 F.2d at 241; *Wolpin v. Philip Morris Inc.*, 189 F.R.D. 418, 422 (C.D.Cal.1999). "The reviewing court may not simply substitute its judgment for that of the deciding court." *Grimes*, 951 F.2d at 241.

## DISCUSSION

The matter now before the Court is whether Institutional Defendants, through their ex parte communications with FTI, have compromised FTI as an independent expert. The Court concludes that Institutional Defendants have in fact engaged in improper ex parte communication such that the Court may no longer rely on an independent analysis from FTI. Further-

more, the Court agrees with Magistrate Judge Foley's conclusion that Defendants have forfeited their opportunity to obtain an independent forensic examination. It was clear from the Court's rulings from the bench during the February 23, 2009 Spoilation Hearing and the Court's forensic orders that FTI was to be an independent, court appointed expert for the purpose of determining whether the emails of Scott Gordon, Brant, and Struever were accessible or if and how they had been removed.

### I. *FTI as Court Appointed Expert*

Plaintiffs argue, and Magistrate Judge Foley found, that FTI was a court appointed expert. Defendants argue that FTI was not a court appointed expert but rather a "party-retained independent expert." (Obj. at 3.) Defendants assert that Magistrate Judge Foley is "the only one who has ever expressed" the view that FTI is an independent expert within the meaning of Federal Rule of Evidence 706. (*Id.* at 2.) According to Defendants, Simon acted in good faith in treating FTI as a party-retained expert "subject to specific guidance articulated by the Court." (*Id.* at 3.)

Rule 706 provides, in full:

(a) Appointment. The court may on its own motion or on the motion of any party enter an order to show cause why expert witnesses should not be appointed, and may request the parties to submit nominations. The court may appoint any expert witnesses agreed upon by the parties, and may appoint expert witnesses of its own selection. An expert witness shall not be appointed by the court unless the witness consents to act. A witness so appointed shall be

---

leave to file replies "as attached in their respective motions." (Doc. # 482 at 2.) The Court therefore reviewed the Replies submitted by Defendants in their motions for leave to file reply briefs. (Docs. ## 480, 481.)

informed of the witness' duties by the court in writing, a copy of which shall be filed with the clerk, or at a conference in which the parties shall have opportunity to participate. A witness so appointed shall advise the parties of the witness' findings, if any; the witness' deposition may be taken by any party; and the witness may be called to testify by the court or any party. The witness shall be subject to cross-examination by each party, including a party calling the witness.

(b) Compensation. Expert witnesses so appointed are entitled to reasonable compensation in whatever sum the court may allow. The compensation thus fixed is payable from funds which may be provided by law in criminal cases and civil actions and proceedings involving just compensation under the fifth amendment. In other civil actions and proceedings the compensation shall be paid by the parties in such proportion and at such time as the court directs, and thereafter charged in like manner as other costs.

(c) Disclosure of appointment. In the exercise of its discretion, the court may authorize disclosure to the jury of the fact that the court appointed the expert witness.

(d) Parties' experts of own selection. Nothing in this rule limits the parties in calling expert witnesses of their own selection.

Fed.R.Evid. 706.

A court may appoint an agreed-upon expert, or appoint its own, so long as the expert consents to act. The witness may, but need not, testify at trial. The Court may allow compensation in an amount according to the Court's discretion. The statute allows that the parties may pay in such proportion as the Court directs.

Defendants mischaracterize the requirements for appointment of a "court appointed" expert as set by Rule 706. Defendants argue that FTI cannot be a court appointed expert as a matter of law, because: (1) the Forensic Examinations Order did not expressly state that the party is appointed and retained by the Court under Rule 706; (2) the Forensic Examinations Order did not contain a provision for FTI's testimony or sworn statement; (3) the Forensic Examinations Order required that FTI communicate with Plaintiff and Defendants to provide the full report, and not the Court; (4) the Forensic Examinations Order contains no provision for cross examination or depositions; (5) FTI did not consent to be retained by a U.S. District Court; (6) the Forensic Examinations Order did not explicitly prohibit ex parte communication; and (7) the parties were empowered to modify the terms of the order. (Obj. at 16–18.)

In the first instance, Defendants' arguments are based largely on non-controlling authority. Defendants rely on a number of cases in which a court followed certain procedures when dealing with a court appointed expert. None of these cases, however, stand for the proposition that those actions undertaken by the courts in those cases are required under Rule 706. The cases cited by Defendants are, in reality, fact-specific dispositions describing how a certain district court interacted with a particular expert at a certain stage in trial.

In particular, Defendants argue that the Court did not actually retain FTI. (Obj. at 16.) Defendants submit a case from the Southern District of New York, *Leesona Corp. v. Varta Batteries, Inc.*, 522 F.Supp. 1304 (S.D.N.Y.1981), to contrast this Court's actions. In *Leesona*, the district court contacted an expert witness agreed upon by the parties. *Id.* at 1311. At the expert's request, the Court mailed pack-

ages of documents with summaries of the party's positions. The court entered a consent order, which provided the expert with instructions on how to prepare for trial. *Id.* This Court did not engage in the same procedures as did the district court in *Leesona,* nor were those steps required. The proceedings in *Leesona* were simply at a different stage than was this action when the Court issued its Forensic Examinations Order and held the Spoilation Hearing. In *Leesona,* a preliminary injunction application and hearing was consolidated with a full trial on the merits, and the trial was advanced in order to be consolidated. *Id.* at 1309. The expert was prepped for trial because the trial and hearing were being held together. In the case at hand, however, FTI was not retained for the sole purpose of testifying at trial. FTI was engaged for the purpose of discovering the existence, if any, of certain emails. Any subsequent trial testimony, or deposition, would be ancillary to this purpose. This is allowed under Rule 706, which states only that a "witness deposition *may* be taken by any party" and the witness "*may* be called to testify by the Court." Fed.R.Evid. 706(a) (emphasis added). There is no requirement under Rule 706 that the Court draft a document detailing FTI's potential future role at trial. Regardless, this Court's Forensic Examinations Order anticipated a potential need for testimony or depositions—as discussed below, FTI is required to complete a report, which could become an issue at trial.

Likewise, Defendants' reliance on *Monolithic Power Systems, Inc. v. O2 Micro International Ltd.,* 558 F.3d 1341 (Fed. Cir.2009), presumes that the witness may only be retained to testify at trial. In *Monolithic,* the district court ordered the expert to make himself available for trial. *Id.* at 1346. The expert was appointed by the court approximately 3 months before

trial, for the purpose of testifying on contested and technically complicated engineering issues. *Id.* at 1345. In contrast, FTI was appointed by this Court to uncover and collect evidence of the existence (or lack thereof) of emails, toward resolution of pre-trial motions.

Indeed, the Ninth Circuit has acknowledged that an expert witness may conduct a variety of tasks, including "advising parties of his findings, submitting to depositions, being called to testify, being cross-examined." *Reilly v. United States,* 863 F.2d 149, 156 (9th Cir.1988). Here, FTI would advise the parties, and thereby the Court, of its finding as to the existence of emails.

Defendants then rely on *Association of Mexican–American Educators v. State of California,* 231 F.3d 572 (9th Cir.2000), to argue that the Court's orders cannot be "transformed" into a Rule 706 appointment in anticipation that FTI may testify. (Obj. at 16.) In *Mexican–American Educators,* the district court expressly appointed an expert as a "technical advisor" and not as an expert witness. 231 F.3d at 590. The court did not require a report from the advisor and did not allow cross examination. *Id.* The Ninth Circuit held that Rule 706 applies only to expert witnesses and not to technical advisors. *Id.* at 591. In that case, however, the district court utilized the advisor in a different capacity than the capacity in which this Court is using FTI. In *Mexican–American Educators,* the district court used the expert to help the court with technical matters to understand the briefing. As the Ninth Circuit noted, the court *did not rely on the expert* as a source of evidence. *Id.* This Court, in contrast, *would have* relied on FTI's findings as a source of evidence. The results from FTI, as to the existence or erasure of emails, was intended to be evidence this Court would consider in dis-

posing of Defendants' spoilation motions. The scenario before this Court, therefore, is inapposite to the scenario in *Mexican–American Educators,* and the Ninth Circuit's distinction that the expert was a mere "technical advisor" is not directly on point. FTI is not appointed to "organize, advise on, and help the court understand relevant scientific evidence." *Federal Trade Comm'n v. Enforma Natural Products, Inc.,* 362 F.3d 1204, 1213 (9th Cir. 2004). Nor is FTI a "tutor who aids the court in understanding the 'jargon and theory' relevant to the technical aspects of the evidence." *Id.* FTI will in fact be supplying the Court, and the parties, with new evidence. As the Ninth Circuit has succinctly stated: "A court-appointed expert is a witness subject to Rule 706 if the expert is called to testify *or if the court relies on the expert as an independent source of evidence."* *Id.*

Moreover, FTI is required to submit a final report to both parties, which would of course become part of the record when the parties discussed the results at a hearing on the spoilation issue or submitted briefing on the matter. As Defendants know, the Court allowed Defendants to renew their spoilation motion and motion for sanctions pending the results of the investigation. (Obj. at 4–5.)

Defendants' next argument that no communication from FTI to the Court was required elevates form over substance. The Forensic Examinations Order requires that, once FTI is able to restore and produce documents, those documents be turned over to Plaintiffs, who will then in turn provide them to the Court if Plaintiffs believe them to be nonresponsive or privileged. (Forensic Exam. Order at 4–5.) The Court, or a special master, would then determine whether these documents could be released to Defendants. This, after all, was the entire purpose behind

appointing FTI—delivering emails to Defendants that should have been uncovered during discovery. The requirement, per court order, that any "hits" for uncovered documents be first reviewed by Plaintiffs and then the Court satisfied the Court that Plaintiffs' and Defendants' rights would be duly protected.

Defendants further argue that FTI did not consent to act as an expert witness for the Court. (Obj. at 17.) This argument is disingenuous, as Defendants themselves document in their Second Emergency Motion that the agreement entered into by FTI was defined by this Court's order. (Sec. Emerg. Mot. at 8.) The agreement read:

> This letter will confirm your retention of FTI Consulting ("FTI"), as electronic discovery and litigation consultants in connection with the above-captioned matter, pursuant to that specific Order Regarding Forensic Examinations of Computer Equipment (the "Order"), dated May 14, 2009. . . . The Order outlines the scope of FTI's services for purposes of the Engagement, and is . . . specifically incorporated herein.

(*Id.*) FTI was clearly retained pursuant to the May 14, 2009 Forensic Examination Order. Furthermore, as to Defendants' insistence that FTI was a party-retained expert because only Defendants were paying FTI, this argument is unavailing. First, as documented above, a court may order payment to an expert "in such proportion and at such time as the court directs." Fed.R.Evid. 706(a). This Court ordered Defendants to bear the responsibility for the charges, but allowed Defendants to shift those costs to Plaintiffs upon an appropriate showing. (Forensic Exam. Order at 6.) Nowhere in Rule 706 or this Court's order is there any indication that Defendants acquire any special rights because of this payment obligation. Second,

the evidence in the record shows that FTI originally intended to form the agreement between both Plaintiffs and Defendants, and therefore it was at least clear to FTI what its role was to be until Defendants exerted influence. In the words of Michael Pace, FTI Senior Managing Director: "Our [FTI's] current thinking is to considering having both sides (plaintiff and defendant), or counsel for both sides, sign the engagement document, in part because the order is entered pursuant to the joint agreement by the parties, and requires us to submit a report to all parties. We have not made a final determination and are pleased to discuss tomorrow morning if you would like." (Sec. Emerg. Mot. Ex. O at 43.) Mr. James Rutten responded to this email: "Let's have Simon as the engaging party since it's the only one paying the bills." (*Id.*) It was never the Court's intention that Defendants treat FTI as their own private expert, as is clear for the record and transcripts.

As to Defendants' argument that the Court allowed the parties to stipulate to modification of the order, it is unconvincing. Parties may stipulate to any number of matters.

Defendants then rely on various courts' use of the phrase "independent expert" in an attempt to show that the phrase does not refer to an expert under Rule 706 but instead to experts retained by a party that are not otherwise employed by that party. (Obj. at 14.) The Court is unconvinced by this argument. First, the majority of these cases are either from out-of-circuit or unpublished and not controlling authority. Second, none of the cases represent that the phrase "independent expert" cannot pertain to an expert appointed under Rule 706. The fact is that this Court appointed an expert, who was to be independent. Moreover, in this case the Court issued a specific order on the matter, and

the matter need not be resolved by parsing speech patterns. The Court will nevertheless address certain cases cited by Defendants.

In particular, this Court's reading of *Williams v. Steuart Motor Co.*, 494 F.2d 1074, 1081 (D.C.Cir.1974), finds no explicit definition of "independent expert witness," Defendants' assertions notwithstanding. The court there was discussing an entirely separate matter and was not investigating Rule 706 requirements. *Gaymar Industries, Inc. v. Cloud Nine, LLC*, 2007 WL 582948, at *3–4 (D.Utah Feb. 20, 2007), an unpublished decision from the District of Utah, is likewise not definitive on this point. The language relied on by Defendants was made in passing by that court.

A Ninth Circuit case cited by Defendants, *United States v. Rivera–Guerrero*, 426 F.3d 1130 (9th Cir.2005), is barely on point at all. This case involved the need to involuntarily medicate a criminal defendant so that he could be rendered competent. *Id.* at 1134. At a hearing on the issue, defense counsel requested a continuance to consult "independent doctors" about the drugs proposed to be used. *Id.* at 1135. "Counsel intended to use the continuance to interview doctors, and help prepare a medical expert who would rebut the testimony of the ... physicians." *Id.* No court order defining the scope of the expert's activities was issued or even contemplated. There was no court order requiring the parties to cooperate if the medical expert evaluated the medicine. In fact, the judge denied the request for the continuance. *Id.*

In *Harris v. Lamarque*, 2005 WL 1704449, at *9–10 (E.D.Cal. July 15, 2005), an unpublished decision from the Eastern District of California, the court referred to a defense expert as an independent expert witness. That is the extent of the court's focus on the expert. The purpose of the

court's discussion was the defendant's ineffective assistance of counsel claim. There was no court order, or even true discussion, about that expert's appointment in any way relevant to Rule 706. Defendants cannot rely on this as "proof" that a court's passing reference to an independent witness precludes that term from applying to a Rule 706 witness.

Defendants further attempt to morph Ninth Circuit language into a definition of "independent expert" when they cite to *Wood v. Stihl, Inc.*, 705 F.2d 1101, 1106 (9th Cir.1983). The Ninth Circuit refers to an expert as independent, but the context of that statement is not instructive here. The court was reviewing whether the trial court improperly rejected the testimony of witnesses. The court once referred to the witness as a "non-party or independent technical expert of the appellant." *Id.* As with the cases discussed above, in *Wood* there is no discussion of the nature of an expert's appointment via court order.

Defendants also clutch to a single sentence fragment from the February 23, 2009 Spoilation Hearing as alleged evidence that the Court never intended to appoint an expert. Defendants quote the Court's question "[D]o you want to do a forensic search . . . ?" (Obj. at 15.) This is entirely out of context from the Court's other statements, as document by Magistrate Judge Foley.

Finally, the Court is not persuaded by Defendants' reliance on *Sterle v. Elizabeth Arden, Inc.*, 2008 WL 961216 (D.Conn. Apr. 9, 2008), an unpublished decision from the District of Connecticut. The case is admittedly similar, and involved a forensic expert appointed to uncover reports. One party sought to stop the exam because the other party provided assistance and materials to the expert. There, the court concluded that the consultant was neutral despite certain communications with one party, in part because the court order required that the consultant be mutually agreed upon. The court held the party who sought to stop the examination in contempt. This Court disagrees with that somewhat conclusory decision. Moreover, the conduct in that case did not rise to the egregious level seen here.

It is astounding to this Court that after extensive discussions on this matter during the February 23, 2009 Spoilation Hearing, Defendants claim that this Court did not make it clear that FTI was to be an independent, neutral, court expert. The fact that this Court's Forensic Examinations Order did not explicitly bar ex parte communication of the level that Defendants purportedly engaged in, as the Court could have, does not obviate the rest of the record that is replete with examples of this Court's intention. The Court, in its discretion, has given Defendants ample opportunities to move forward with their spoilation motions and forensic discovery.[4] Defendants now apparently seek to take advantage of the Court's lenience.

As documented by Magistrate Judge Foley's Order and Plaintiffs' Opposition, the Court repeated multiple times during the February 23, 2009 Spoilation Hearing that the expert would have to be independent, approved by both parties and the court, operate under a strict order, with production made to the court. (Pl.'s Opp'n at 5 n. 1.) At the hearing, the Court specifically forbade Defendants from doing a forensic analysis on its own without the Court. The Court specifically instructed

---

**4.** Defendants did not move for forensic examination of Plaintiffs' computers during discovery or soon thereafter. Nevertheless, this

Court allowed a forensic examination to go forward.

Defendants that a court order would be required before an expert was retained. (*Id.* at 8 n. 3.) Indeed, as Plaintiffs note, the "core principle governing the Court's May 14, 2009 designation of [FTI] to conduct forensic examinations of Gordon's computers was that the examiner must be an 'independent third party expert' who would operate only under 'a very strict order.'" (Pl.'s Resp. to Sec. Emerg. Mot. at 2 (citing Transcript of Feb. 23, 2009 at 22–23, 54).) And the Forensic Examinations Order itself explicitly requires that the parties cooperate to carry out the terms of the order—Defendants were not given free reign to independently communicate with FTI about executing FTI's tasks. (Forensic Exam. Order at 6.)

Defendants themselves seem to acknowledge that the forensic examination was a Court-ordered process in their own Second Emergency Motion when they argue that "the forensic examination 'sideshow' is not 'Simon's,' but a process ordered by the Court." (Sec. Emerg. Mot. at 3.) Defendants cannot have it both ways; Defendants may not argue that the forensic examination was court-ordered when supporting their own spoilation motion, and then argue that the court merely provided the scope of independent examination by a "party-retained" expert when disputing the Magistrate Judge's findings and recommendation.

As a final matter, Plaintiffs state that the communications between FTI and Defendants may have been privileged, were it true that FTI was a party-retained expert. (Opp'n at 8.) This matter is not fully briefed by the parties, but the Court will note that Defendants have not attempted to assert any privilege regarding the communications that Plaintiffs and Magistrate Judge Foley have reviewed.

For the reasons discussed above, the Court hereby adopts Magistrate Judge Fo-ley's finding that FTI was a court appointed expert pursuant to Rule 706.

## II. *Defendants' Ex Parte Communication with FTI Consulting*

### A. *Institutional Defendants*

There is a meaningful distinction between communicating with FTI on practical details such as scheduling the date and time of examinations, and holding meetings with FTI without notifying opposing counsel and providing FTI with legal documents, some of which were under a protective order.

According to Mr. Rutten, Institutional Defendant's attorney, Mr. Rutten and his law firm supplied FTI with various legal documents that FTI was not able to access on its own. (Rutten Sec. Emerg. Mot. Decl. ¶ 8.) Mr. Rutten stated:

> [W]e supplied [FTI] with various documents that were not available on PA-CER or that are otherwise germane to its work as a forensic examiner. For example, FTI asked me for examples of Scott Gordon e-mails that had been produced solely from the files of people other than Scott Gordon. FTI told me that having such examples might help it refine its forensic searching. FTI was given several examples in response to this request.

(*Id.*) Apparently, Plaintiffs were not contacted before Defendants provided FTI with these case documents.

Institutional Defendants also provided FTI with copies of Plaintiffs' Opposition to Defendants' Spoilation Motion, Defendants' own motion and exhibits, and transcripts of depositions. (*Id.* at 16–20.) Notably, FTI was not able to access some of these documents on its own due to the protective order in place. It is apparent from the record that Institutional Defendants did not coordinate with Plaintiffs or

even notify Plaintiffs prior to releasing these protected court records to FTI.

The Forensic Examinations Order clearly delineated FTI's tasks and the scope of information FTI was to review. FTI was instructed to examine only certain identified computer equipment. (Forensic Exam. Order at 1–2.) Paragraph 8 bound FTI to the terms of the February 7, 2007 Confidentiality Protective Order as pertaining to the *data* FTI might uncover from the computers. (*Id.* at 6.) Nowhere in the Order was FTI instructed to review the parties' legal documents. If FTI truly needed to review legal documents or other emails, then Institutional Defendants should have cooperated in good faith with Plaintiffs, and certainly informed Plaintiffs of FTI's request, in conformance with the Forensic Examinations Order's mandate to cooperate. Even assuming FTI initiated some of the communication with Institutional Defendants and counsel, the parties to this case are bound by this Court's orders and are accountable.

The May 19, 2009 meeting between defense counsel and FTI in particular gives this Court pause. Defense counsel argues that this private ex parte meeting was necessary to discuss FTI's qualifications as the forensic expert, to discuss who would perform the work, and coordinate logistics of travel and computer access. The Court questions this rationale, as did Magistrate Judge Foley. Mr. Rutten admitted that FTI was proposed as the expert as early as March 24, 2009, and confirmed by Plaintiffs on April 14, 2009. Why a meeting in May was needed is not clear. Certainly, if the true purpose was to coordinate travel and computer access, then Plaintiffs should have been involved, as it was their computer equipment that was to be inspected.

Counsel's argument that the "forensic examinations are important to Simon, and Simon is the only one paying FTI's bills," is both disingenuous and unconvincing. First, it is true that Institutional Defendants are fronting the costs per the Court's order, but the Court also anticipated that Institutional Defendants might seek reimbursement from Plaintiffs.[5] (Forensic Exam. Order at 6.) Second, the examinations are equally important to Plaintiffs, as the results could have a direct bearing on this Court's ruling on Defendants' spoilation motions.

As for the controversy surrounding the extent of FTI's involvement in the dispute over the "water damaged laptop," these events as summarized in the F & R add to the overall air of impropriety that has characterized the entire forensic examination process. FTI does not work for Defendants, and Defendants should not have attempted to use FTI as a liaison with Plaintiffs' offices or counsel.

Defendants argue that Plaintiffs also had ex parte contact with FTI. In their Objections, Defendants state that "Plaintiffs forced a situation where they had exclusive access to FTI while FTI imaged the servers." (Obj. at 20.) According to the record, FTI was in the Greenwich offices to conduct imaging of computer servers at the same time that Gordon's general counsel was present in his office. This is not the type of "ex parte communication" that is reasonably barred under the Court's orders. The Court never directed staff to vacate their place of business while FTI conducted its investigation. This type of contact pales in comparison to the purposeful exchanges Defendants entered into with FTI.

---

**5.** Paragraph 7 of the order states "Defendants shall bear responsibility for FTI Consulting's charges, without prejudice to Defendants' right to seek to shift those costs to Plaintiffs upon an appropriate showing." (Forensic Exam. Order at 6.)

Defendants emphasize, and seemingly use as a defense for their own conduct, that Plaintiffs have not been forthcoming with evidence. Indeed, this possibility is why this Court engaged an independent expert. However, Defendants may not then violate the terms of this Court's order as they strive to uncover evidence.

█ These ex parte meetings with FTI and Institutional Defendants' delivery of legal documents to FTI without consulting with Plaintiffs, taken as a whole, leave this Court to conclude that FTI's role as an independent expert has been compromised. This Court cannot rely on the results in FTI's investigation when evaluating Defendants' spoilation allegations. Institutional Defendants treated FTI as their own personal expert, without giving due respect to this Court's directions in the Spoilation Hearing and the Forensic Examinations Order. In its *de novo* review, this Court has come to the inescapable conclusion that FTI's impartiality as a forensic expert was destroyed for these purposes. The Court ordered that Defendants work cooperatively with Plaintiffs in good faith, and Institutional Defendants have violated this order. The Court sought to rely on FTI's findings as evidence, but due to Institutional Defendants' own actions, FTI's role as impartial expert is no longer reliable.[6] Defendants have forfeited any further opportunity to obtain an independent forensic examination.

### B. *Individual Defendants*

Individual Defendants separately object to the F & R on the basis that "stopping the forensic examination process would sanction the Individual Defendants for allegedly 'improper' conduct that neither they nor their counsel played any part in." (Individual Def. Obj. at 1.) The Court questions this reasoning, as Individual Defendants have largely joined with Institutional Defendants' motions and did not separately request a forensic exam. The parties dispute Individual Defendants' role in these requests. There is also no briefing before this Court concerning whether Individual Defendants at any time opposed Institutional Defendants and counsel's activities or to what extent they were aware of the behavior. These issues notwithstanding, however, the fact remains that this Court cannot rely on the independence of FTI. To allow the examinations to go forward for Individual Defendants but not Institutional Defendants is senseless.

### C. *Remedy*

Defendants argue that, even if this Court were to find that FTI's impartiality has been compromised, the Court should consider a "less severe remed[y] than shutting down the search for missing evidence." (Obj. at 23.) Defendants cite to *In re Phenylpropanolamine (PPA) Products Liability Litigation*, 460 F.3d 1217, 1228 (9th Cir.2006), to support their argument that this Court must consider less drastic "sanctions." The case Defendants rely on, however, deals with outright dismissal of actions. The Ninth Circuit stated: "The district court abuses its discretion if it imposes a sanction of dismissal without first considering the impact of the

---

6. The court is unconvinced by Defendants' arguments that FTI role has not been corrupted "because FTI is not tasked with making 'soft' determinations such as psychological evaluations or credibility judgments." (Obj. at 23.) FTI is charged with examining computer hardware and data, and is an independent expert that this Court intended to rely upon for technical evidence about which this Court has no comparable expertise. This Court cannot and should not rely upon evidentiary reports that are produced by an expert that was in essence treated as and operated like one party's private expert.

sanction and the adequacy of less drastic sanctions." *Id.* (quotations omitted).

This Court is not ordering a dismissal of this action. The Court is not at this time holding either party or counsel in contempt. The Court is merely putting a stop to evidentiary discovery that the Court, in its considered discretion, allowed to proceed despite the fact that discovery had concluded.[7] The Court proposed an independent expert for the purposes of uncovering additional evidence that Defendants believed might be available, even though the time period for discovery had long passed. That expert has now been compromised. The Court's remedy in this case is not to enter a final judgment against Defendants, but rather to restrict the tainted evidence resulting from those investigations.

Defendants suggest that FTI "hand off the data it collected to another agreed-upon vendor, who can perform the work in FTI's stead." (Obj. at 24.) The Court declines to appoint another expert. As discussed above, the time for discovery has long since passed. The Court was willing to entertain additional evidentiary discovery for the purposes of Defendants' spoliation motion, but Defendants have abused their opportunity. This affair has been conducted at great cost and burden to both parties and this Court.

## III. *Defendants' Second Emergency Motion*

The Court recognizes, as it has before, that the minimal email production by Plaintiffs is troubling. The Court's interest in uncovering any remaining emails did not, however, give Institutional Defendants free reign to improperly use the appointed independent expert.

Defendants' Second Emergency Motion presumes that FTI's forensic examination will go forward. For reasons discussed above in this Court's *de novo* review, it may not. To quote Magistrate Judge Foley: "Because Defendants' counsel have acted improperly and have compromised the forensic expert's impartiality, Defendants have forfeited the opportunity to obtain an independent forensic examination." (F & R at 18.) Accordingly, the Court hereby adopts the findings and recommendation, and Defendants' motion is DENIED WITH PREJUDICE.

## IV. *Plaintiffs' Counter Motion Regarding the Court's Forensic Examinations Order and Spoliation Order*

Plaintiffs request that this Court vacate the May 14, 2009 Forensic Examinations Order, order all computer materials obtained by FTI returned to Plaintiffs, and modify the March 9, 2009 Spoliation Order to deny Defendants' spoliation motion with prejudice.

First, for the reasons set forth above, this Court adopts the Magistrate Judge's recommended and VACATES this Court's Forensic Examinations Order. All forensic examinations of Plaintiffs' computers, as described in the order, shall cease immediately as of the date this Order is filed. All computer materials obtained from Plaintiffs by FTI shall be returned to Plaintiffs within 30 days of the filing of this Order.

Second, the Court MODIFIES its March 9, 2009 Spoliation Order to now DENY WITH PREJUDICE Defendants' December 1, 2008 motion for "(A) Dismissal of claims, or in the alternative, an adverse inference instruction; and (B) Monetary sanctions." Defendants' motion had sought dismissal of Plaintiffs' claims and/or sanctions based on Plaintiffs' alleged spoliation of evidence. This Court, in the

---

7. The time period for factual discovery con- cluded on May 1, 2008, with some exceptions.

Spoilation Order, determined that Defendants had not demonstrated that emails were, in fact, destroyed, had not proved Plaintiffs' duty to preserve certain email files, and had not proven that Plaintiffs had in fact spoiled evidence at all. At that time, the Court denied Defendants' motion without prejudice because a forensic examination was anticipated. This forensic examination is now terminated. Therefore, Defendants have not met their burden to demonstrate spoilation. The motion is therefore denied with prejudice.

### CONCLUSION

For the reasons stated above, the Court: (1) Adopts the Magistrate Judge's Findings and Recommendations on the Motions Regarding Forensic Examinations; (2) Denies with Prejudice Defendants' Second Emergency Motion; (3) Grants Plaintiffs' Counter motion; (4) Vacates this Court's May 14, 2009 Order Regarding Forensic Examinations of Computer Equipment; and (5) Modifies this Court's March 9, 2009 Order.

The Court's March 9, 2009 Order is now modified to Deny with Prejudice Defendants' December 1, 2008 motion for "(A) Dismissal of claims, or in the alternative, an adverse inference instruction; and (B) Monetary sanctions."

All forensic examinations of Plaintiffs' computers shall cease immediately as of the date this Order is filed. All computer materials obtained from Plaintiffs by FTI shall be returned to Plaintiffs within 30 days of the filing of this Order.

IT IS SO ORDERED.

## FINDINGS AND RECOMMENDATION

GEORGE FOLEY, JR., United States Magistrate Judge.

### Motions Regarding Forensic Examinations

This matter is before the Court on the following matters:

(1) Defendants' Second *Emergency* Motion to Enforce Orders Regarding Forensic Examinations and Related Relief (# 451), filed on June 18, 2009;

(2) Plaintiffs' Response to Defendants' Second *Emergency* Motion to Enforce Orders Regarding Forensic Examinations and Related Relief and Plaintiffs' Counter–Motion to Vacate Court's May 14, 2009 Order, Modify Court's March 9, 2009 Order, and Related Relief (# 452, # 453), filed on June 23, 2009;

(3) Defendants' Reply Memorandum in Support of Second *Emergency* Motion to Enforce Orders Regarding Forensic Examinations and Related Relief and Defendants' Opposition to Plaintiffs' Counter–Motion to Vacate Court's May 14, 2009 Order, Modify Court's March 9, 2009 Order, and Related Relief (# 456, # 457), filed on June 26, 2009; and

(4) Plaintiffs' Reply in Support of Counter–Motion to Vacate Court's May 14, 2009 Order, Modify Court's March 9, 2009 Order, and Related Relief (# 460), filed on June 30, 2009.

These motions arise out of previous motions that were heard and decided by District Judge David Ezra. Judge Ezra is currently presiding over a criminal jury trial in this district which is expected to last several more weeks or months. He therefore referred the foregoing motions to the undersigned United States Magistrate Judge. The Court conducted an initial status hearing regarding these motions on July 2, 2009 and thereafter heard oral argument on July 31, 2009.

### BACKGROUND

On December 1, 2008, Defendants filed a Motion for (A) Dismissal of All Claims, or

in the Alternative, an Adverse Inference Instruction; and (B) Monetary Sanctions, Based on Plaintiffs' Spoliation of Evidence (# 399) (hereinafter "Spoliation Motion"). Defendants argued that Plaintiffs had, at minimum, negligently destroyed or failed to preserve relevant email communications of three of its principal officers who were involved in the transactions underlying the claims in this lawsuit. In particular, Defendants argued that Plaintiffs had only produced four emails of Scott Gordon who was Plaintiffs' president from 2001 to Fall 2007. Defendants argued that such minuscule production was incredible because Scott Gordon was involved in the events underlying this lawsuit and was a frequent user of email, and because Defendants had obtained other relevant Scott Gordon emails from other sources. The Spoliation Motion also concerned the destruction of emails of former Gordon officers and employees, Hanna Struever and Randall Brant. Ms. Struever and Mr. Brant left Plaintiffs' employment in 1999 and 2001, respectively, and their email files were allegedly expunged from the computers pursuant to company policy or procedure.

Judge Ezra conducted a hearing on Defendants' Spoliation Motion on February 23, 2009. Information provided to the Court indicated that potentially relevant emails were erased from a laptop computer Scott Gordon had used before that laptop computer was transferred to another of Plaintiffs' employees in 2003. Plaintiffs represented, however, that the emails and other data on Scott Gordon's laptop would have been copied onto his new laptop computer prior to the erasure. It was unclear at the time of the hearing, however, what had become of Mr. Gordon's "new" laptop. Mr. Gordon's laptops were also connected to a network and the emails would have automatically been downloaded into Plaintiffs' computer server(s). One of the servers was reportedly replaced in 2001 and the data on that server was transferred to a "New Server" at that time. The electronic data on the old server was later erased in 2006. Although Plaintiffs represented to the Court that they conducted a search of the computer servers in accordance with the search protocol agreed upon by the parties, only four emails of Scott Gordon were discovered. Plaintiffs acknowledged, however, that they did not conduct a "forensic" search of their computer hard drives to determine whether additional, relevant Scott Gordon emails may be located therein.

Judge Ezra concluded that Defendants' Spoliation Motion could not be granted on the record presented because of the possibility that Scott Gordon's and the other officers' emails may still be located on one or more computer hard drives in Plaintiffs' possession, custody or control. Although Judge Ezra suggested that a forensic inspection of Plaintiffs' computers would have been appropriate under the circumstances, he initially indicated that he would not permit additional discovery or authorize a forensic examination of Plaintiffs' computer hard drives because the Defendants had not moved for such relief during the discovery period or within a reasonable time after its expiration. *Motion (# 451), Exhibit "A", 2/23/09* Hearing Transcript, pages 22–23. As the hearing progressed, however, Judge Ezra expressed his concern and scepticism about Plaintiffs' inability to explain why it was unable to produce relevant emails of Scott Gordon which still should be located on Plaintiffs' server(s). These concerns, which led Judge Ezra to reverse his initial position and authorize a forensic examination, are summarized in the Court's order (# 437) filed on March 9, 2009 at page 15.

During the February 23, 2009 hearing, Judge Ezra also discussed the "new" laptop computer to which Scott Gordon's

emails had reportedly been transferred in 2003. Judge Ezra ordered Plaintiffs to provide information regarding "what happened" to the 2003 laptop, where it was located, or the location of other computers to which its data had been transferred so that those computers could be forensically examined if Defendants desired such an examination. *Motion (# 451), Exhibit "A"*, 2/23/09 Hearing Transcript, pages 46–47.

During the February 23, 2009 hearing, Judge Ezra repeatedly stated that a forensic examination would have to be conducted by an independent forensic expert or group of experts. In initially addressing Defendants' counsel about a forensic examination, Judge Ezra stated:

> I mean, now, that doesn't mean you would have access to all of the information on there; it would have to be produced to the Court in camera so that private information that had nothing to do with this wouldn't be turned over, so we would have to get an independent third-party expert to do that, and then they would produce the files not to you, but to the Court for in camera inspection ...

*Motion (# 451), Exhibit "A"*, 2/23/09 Hearing Transcript, pages 22–23.

Addressing Plaintiffs' counsel about the forensic inspection, the Court stated: "It would have to be independent and it would have to be for in-camera review because it would be wholly unfair to either side—I wouldn't do it to the Simon Group either." *Id.*, at page 47. Later, addressing Defendants' counsel, the Court stated: "Now, the next question is do you want to do a forensic search on that server by an independent expert to find out whether, in fact, there are retrievable emails on there for the relevant time periods sent to or from Mr. Gordon? ..." *Id.*, at page 53. In discussing how the information could be

retrieved from Plaintiffs' servers and hard drives, the Court stated: "Again, it would have to be by an independent group that was approved by both parties and the Court with a very strict order in place." *Id.*, at page 53. Finally, in discussing the forensic examination, the Court advised Defendants' counsel:

> If you decide you want to do that, of course, you need to contact me first because we have to work out an order. We have to get the people involved who are going to be in a position to do that. We have to get a timeframe. Your client will bear the cost of that at this time. If it turns out that it can be later determined at trial or thereafter that there was an intentional deletion; in other words, it was some sort beyond negligence now, but an intentional deletion, the Court might shift the burden of those expenses to the other side.

*Id.*, at pages 55–56.

The parties agreed on April 14, 2009 that FTI Consulting would perform the forensic examination. *Motion (# 451), Rutten Affidavit,* ¶ 7. On April 24, 2009 Defendants filed an Emergency Motion to Enforce Orders Regarding Forensic Examinations (# 443) in which they accused Plaintiffs of "foot-dragging" and "stonewalling" in providing information about the computers that Scott Gordon used or may have used and in refusing to agree to a stipulated order governing which computers would be subject to the forensic examination and the scope of that examination. Defendants submitted with their motion a proposed order governing the forensic examination to be performed by FTI. Defendants' Motion also stated:

> The proposed order ensures that the independent entity that will conduct the forensic examination is one that Plaintiffs have already approved for the pur-

pose—FTI Consulting, a nationally renowned expert in this area. *Motion (# 443)*, page 15.

Defendants' motion also asked that the Court order Plaintiffs to answer three questions regarding "Scott Gordon's 2003 Laptop." *Id.*

In their Opposition (# 446) filed on May 4, 2009, Plaintiffs denied the accusations of foot-dragging and stonewalling. Plaintiffs further stated that they agreed to the revised version of the proposed order governing the forensic examination attached to Defendants' motion which had not been submitted to them for approval prior to the filing of the motion. Plaintiffs, however, opposed Defendants request that they be required to answer Defendants' proposed questions regarding "Scott Gordon's 2003 Laptop."

It appears that Defendants' counsel contacted FTI about the case and its willingness to perform the forensic examination after Plaintiffs filed their opposition on May 4, 2009 in which they stated that they had no objection to the proposed order governing the forensic examination. The earliest email between FTI and Defendants' counsel is dated May 6, 2009. *Motion (# 451), Exhibit "O"*, page 6. This email appears to be a follow-up to a telephone call between Mike Pace of FTI and one of Defendants' attorneys, George Garvey. Mr. Pace states in his correspondence summary that "some time prior to 5/7," he spoke with Defendants' assistant general counsel Jack Boyd regarding FTI's forensic capabilities and that he also received a call from attorney Garvey regarding FTI performing work related to the Simon/Gordon litigation. *Defendants' Reply Brief (# 456, # 457), Exhibit "A"*.

According to Defendants, FTI began reviewing various pleadings on PACER to inform itself about the case, the spoliation issue being litigated, and the technical issues that it might encounter. *Motion (# 451), Rutten Affidavit*, ¶¶ 7–8. Mr. Rutten further states that FTI posed various questions to him and others in his law firm and they supplied FTI with various documents that were not available on PACER. *Id.*, ¶ 8. Emails attached to Defendants' Motion show that on May 11, 2009 Defendants' counsel provided FTI with copies of Plaintiffs' opposition to the Spoliation Motion and a transcript of the February 23, 2009 hearing. Defendants also provided FTI with the exhibits to Defendants' Spoliation Motion and the transcripts of the Fed.R.Civ.Pro. 30(b)(6) depositions regarding Plaintiffs' data/document retention. *Motion (# 451), Exhibit "O"*, pages 16–20. Defendants' counsel did not notify Plaintiffs' counsel that they had provided these documents to FTI.

On May 14, 2009, the Court entered order (# 449) governing the forensic examination. The first sentence of that order states: "Pursuant to the Court's order dated March 9, 2009 and its orders in open court on February 23, 2009, and pursuant to the joint agreement of the parties hereto, the Court hereby enters the following additional order: ..."

Paragraph (3) of the order charges FTI Consulting with performing two related, but distinct investigative tasks. The first task is to determine if the computer equipment described in paragraph (1) of the order contains sent or received e-mails for Scott Gordon, Randall Brant and Hanna Struever during the "Relevant Period," January 1, 1989 to September 30, 2003 and to restore any deleted emails for these individuals to the extent they can be restored. FTI is to then perform a search of the emails pursuant to the parties' previously agreed upon search protocol for relevant emails. Any potentially relevant emails discovered in this process shall first be provided by FTI to Plaintiffs' counsel

for review and objection. The emails, together with Plaintiffs' privilege log, shall then be submitted to the Court for *in camera* review and entry of an order for production of relevant, non-privileged emails and documents. FTI's second investigative task is to determine "(d) whether e-mails from the Relevant Period that reside or formerly resided in each of the email boxes have been deleted, and if so, when they were deleted; how they were deleted ...; who deleted them; whether they were deleted piecemeal, en masse, or in some combination thereof; and whether any of the data can be restored; and (e) any information bearing on whether data from the Relevant Period was deleted under circumstances evincing any effort to destroy or to conceal evidence." *Order (# 449)*, page 3.

On May 14, 2009, the Court also entered a separate order (# 450) which denied Defendants' motion to require the Plaintiffs to answer questions about (1) the circumstances of Plaintiffs discarding Scott Gordon's 2003 laptop and when it was discarded; (2) whether Plaintiffs discarded other laptops that were owned or used by Scott Gordon for work purposes and, if so, when they were discarded; and (3) the approximate dates that Scott Gordon used any of the computers disclosed by Plaintiffs' counsel in a March 13, 2009 letter to Defendants' counsel. The Court stated that Defendants' proposed interrogatories seek "to establish a factual basis for a later claim of spoliation. As the discovery deadline has long passed in this case, such interrogatories are untimely and irrelevant to the issue presently before the Court (i.e. forensic examination of that equipment to which the parties presently have access.)" *Order (# 450)*, pages 2–3. The Court did, however, require Plaintiffs to disclose the locations of any computers that would be subject to the forensic examination. *Id.*

On May 14, 2009 Defendants' counsel James Rutten emailed a copy of order (# 449) to FTI's representatives Mike Pace and Eric Matrejek. Upon receipt of the order, Mr. Pace responded in part as follows:

> We expect to provide an engagement document by close of business tomorrow, or by Monday at the latest. Our current thinking is to consider having both sides (plaintiff and defendant), or counsel for both sides, sign the engagement document, in part because the order is entered pursuant to the joint agreement by the parties, and requires us to submit a report to all parties. We have not made a final determination and are pleased to discuss tomorrow morning if you would like.

*Motion (# 451), Exhibit "O"*, page 43.

Mr. Rutten sent an immediate email response stating: "Let's have Simon as the engaging party since it's the only one paying the bills." *Id.*

The first paragraph of FTI's Engagement Letter, which was executed by FTI and Defendants' general counsel on or about May 21, 2009, states as follows:

> This letter confirms your retention of FTI Consulting, Inc. ("FTI") as electronic discovery and litigation consultants in connection with the above captioned matter, pursuant to that specific Order Regarding Forensic Examinations of Computer Equipment (the "Order") dated May 14, 2009.... The Order outlines the scope of FTI's services for purposes of the Engagement, and is attached and specifically incorporated herein.

*Motion (# 451), Exhibit "O"*, page 75.

Defendants' counsel made arrangements for FTI consultants Mike Pace, Eric Matrejek and Brett Harrison to travel to Defendants' offices in Indianapolis,

Indiana on May 19, 2009 to meet with Defendants' litigation counsel, Mr. Rutten, and Defendants' assistant general counsel, Jack Boyd. According to Mr. Rutten's affidavit, the purpose of this meeting was for Defendants' counsel to confirm that FTI's personnel were sufficiently knowledgeable and experienced to perform the forensic search. *Motion (# 451)*, Affidavit of James Rutten, ¶ 9. According to the brief "correspondence summaries" of the meeting provided by Mr. Pace and Mr. Harrison, the meeting involved a discussion of FTI's qualifications, who would perform the work, and logistics of travel and access to perform the work. *Defendants' Reply Memorandum (# 456), Exhibit "A".* Mr. Matrejek has not provided a summary of his recollection of this meeting. Defendants' counsel did not inform Plaintiffs' counsel that they were arranging such a meeting with the FTI consultants or invite Plaintiffs' counsel to attend. Nor did Defendants' counsel inform Plaintiffs' counsel that such a meeting had occurred until the dispute regarding FTI's independence arose.

Pursuant to the Court's May 14, 2009 Order (# 450), Plaintiffs were required to inform Defendants on or before May 29, 2009 where the laptop Scott Gordon used in 2003 is currently located and to identify the locations of any subsequent laptops to which data from the 2003 laptop had been transferred. *Order (# 450),* page 3. On May 29, 2009, Plaintiffs' counsel Richard Pocker sent a letter to Defendants' counsel stating that the laptop Scott Gordon used up to August 2003 was last known to be in the possession of Peg Rehill, a former employee of the Gordon Group. Plaintiffs' counsel provided Defendants with Ms. Re-

hill's last known address. *Motion (# 451), Exhibit "E".*[1]

Mr. Pocker's May 29th letter further advised:

2. The laptop to which Scott Gordon's data was transferred in August 2003 may have incurred inadvertent water damage in January 2004. After a diligent search, Gordon has found no further information regarding the subsequent whereabouts of the computer or the fate of its data.

*Motion (# 451), Exhibit "E".*

Defendants' counsel sent a letter to Mr. Pocker on June 2, 2009 in which he asked a number of questions concerning the above statements. *Motion (# 451), Exhibit "I".* The questions included whether the laptop had, in fact, incurred water damage, the last known location of the laptop computer, where the computer was located when it was allegedly damaged, and to whom the laptop was "given, sold or transferred." Plaintiffs' counsel refused to respond to these additional inquiries on the grounds that they have fully complied with the Court's order (# 450).

Defendants' counsel Mr. Rutten also forwarded Mr. Pocker's May 29, 2009 letter to Mike Pace of FTI Consulting on June 2, 2009 with the following request or suggestion:

One question you might want to pose while your at plaintiffs' offices [to obtain a forensic image of the server] is whether data from the "possibly water damaged" laptop was copied onto other computers used by Scott Gordon. I don't have Brett Harrison's email, so I would

1. According to Mr. Rutten, he subsequently made telephone contact with Ms. Rehill who stated that she had given the computer to a family member. Ms. Rehill agreed to inquire whether the laptop still exists and to call Mr. Rutten back. She did not do so, however, and subsequent efforts to contact her were unsuccessful. *Motion (# 451), Rutten Affidavit,* ¶ 12.

appreciate it if your could forward this to him.

*Motion (# 451), Exhibit "O", page 93 (bracketed material added by the Court).*

In a follow-up email, Mr. Rutten clarified that this question should only be posed to Tim Fitzgerald who is an "in-house" attorney for Plaintiffs and works in the office where the computer server to be imaged was located. *Id., Exhibit "O", page 92.* According to Plaintiffs, FTI's consultant Brett Harrison entered Mr. Fitzgerald's office on June 3, 2009 and asked "for details regarding the 'water damaged' laptop." Mr. Fitzgerald asked Mr. Harrison how he knew about the water damaged laptop and Mr. Harrison responded that Simon's counsel had sent him an email about it the previous night. Mr. Fitzgerald allegedly asked Mr. Harrison about any other *ex parte* communications he may have had with Simon or its representatives and Mr. Harrison allegedly stated that there were none. Plaintiffs have not submitted an affidavit by Mr. Fitzgerald.

After FTI completed its imaging of Plaintiffs' computer server in Greenwich, Connecticut on June 3, 2009, FTI's consultant, Mr. Harrison, advised Mr. Rutten that once the image of the server was reviewed at FTI's facilities, it was determined that some of the server did not copy effectively because the server was not turned-off during the imaging. Mr. Harrison indicated that he needed to re-image certain portions of the server while it was shut down and offered to do so after business hours. *Motion (# 451), Rutten Affidavit,* ¶ 16. Mr. Rutten sent an email to Plaintiffs' counsel regarding this matter and requested and proposed dates for the re-imaging. *Id.,* ¶ 17.

By this point, however, Plaintiffs' counsel were disturbed by what they perceived to be Defendants' counsel's disregard of FTI's role as an independent expert and the attempt to use FTI to obtain information about Scott Gordon's "water damaged laptop" that was allegedly outside the scope of FTI's assignment. Plaintiffs' counsel also advised that the need for re-imaging was contrary to the information that FTI had provided to Plaintiffs' representatives at the time imaging was performed. Plaintiffs' counsel stated that any such request should be made to Plaintiffs directly by FTI rather than being filtered through the Defendants' counsel. Plaintiffs' counsel was also unwilling to permit re-imaging of the shut down server after work hours because it would require Plaintiffs to have personnel onsite who would not otherwise be in the office at that time. Plaintiffs' counsel also demanded that Defendants' counsel and FTI provide Plaintiffs with all communications between them. *Motion (# 451), Exhibit "N", Plaintiffs' counsel's June 8, 2009 letter.* Defendants subsequently produced a copy of their email and other written communications with FTI. Summaries of FTI's communications with Defendants' representatives were subsequently provided by Mr. Pace and Mr. Harrison. *Defendants' Reply Brief (# 456, # 457), Exhibit "A".*

On July 2, 2009, FTI consultant Mike Pace informed Defendants' counsel that FTI was able to resolve the issue with respect to the Greenwich, Connecticut server and it no longer needs to re-image a portion of the server. Defendants have accordingly withdrawn that portion of their *Motion (# 451)* that requested that the server be made available for re-imaging. *See Notice of Withdrawal (# 465),* filed on July 15, 2009. At the July 31st hearing, Defendants' counsel also advised the Court that following the initial status hearing on July 2, 2009, Defendants directed FTI to suspend its forensic investiga-

tion pending the Court's decision on the pending motions.

## DISCUSSION

Defendants' Emergency Motion (# 451) requests that the Court order Plaintiffs (1) to answer "FTI's question about whether data from the New Laptop was copied to other devices"; (2) that Plaintiffs' counsel be required to participate in all communications with FTI going forward "so that they are no longer able to manufacture attacks on FTI's independence" or that the Court adopt some other process to govern the parties' communications with FTI pending the completion of its forensic assignment; (3) that Plaintiffs be required to respond to six interrogatories and a document request "relating to the newly raised issue of 'possible water damage' to the missing New Laptop"; and (4) that Plaintiffs be ordered to reimburse Defendants for the fees and costs incurred in bringing its motion. *Motion (# 451)*, pages 18–21.

Plaintiffs argue in their Response and Countermotion (# 452) that Defendants have engaged in improper unilateral and "secret" communications with FTI Consulting, Inc. Accordingly, Plaintiffs request that the Court (1) vacate the May 14, 2009 forensic examination order; (2) require that all computer materials obtained from Gordon by FTI be returned to Gordon; (3) that FTI be disqualified from appearing further in this matter; and (4) that the Court modify its March 9, 2009 order and deny Defendants' Spoliation Motion with prejudice. *Response/Countermotion (# 452)*, page 3.

■ The Court's verbal and written orders in this case do not expressly set forth the legal authority under which FTI was appointed as an independent expert. The district court has the inherent power to appoint an expert as a technical advisor to the court. *Reilly v. United States*, 863 F.2d 149, 155 n. 4 (1st Cir.1988). No specific rules govern the appointment of such expert advisors. The court's appointment of an independent expert *witness*, however, is governed by Rule 706 of the Federal Rules of Evidence. "A court appointed expert is a witness subject to Rule 706 if the expert is called to testify or the court relies on the expert as an independent source of evidence." *Federal Trade Comm'n v. Enforma Natural Products, Inc.*, 362 F.3d 1204, 1213 (9th Cir.2004), *citing Association of Mexican–American Educators v. State of California*, 231 F.3d 572, 591 (9th Cir.2000) and *Reilly v. United States*, 863 F.2d at 156–57. Rule 706(a) provides as follows:

> The court may on its own motion or on the motion of any party enter an order to show cause why expert witnesses should not be appointed and may request the parties to submit nominations. The court may appoint any expert witnesses agreed upon by the parties, and may appoint expert witnesses upon its own selection. An expert witness shall not be appointed by the court unless the witness agrees to act. A witness so appointed shall be informed of the witness' duties by the court in writing, a copy of which shall be filed with the clerk, or at a conference in which the parties shall have the opportunity to participate. A witness so appointed shall advise the parties of the witness' findings, if any; the witness' deposition may be taken by any party; and the witness may be called to testify by the court or any party. The witness shall be subject to cross-examination by each party, including a party calling the witness.

One of the principal reasons for the court to appoint an expert witness is to obtain impartial testimony to aid the court or the jury in resolving a scientific issue.

*Monolithic Power Systems, Inc. v. O2 Micro International Ltd.*, 558 F.3d 1341, 1347 (Fed.Cir.2009), citing McCormick on Evidence § 8 (4th Ed.1992). Under Ninth Circuit law, district courts enjoy wide latitude in regard to the appointment of experts under Rule 706. *Monolithic,* 558 F.3d at 1348, citing *Walker v. American Home Shield Long Term Disability Plan,* 180 F.3d 1065, 1071 (9th Cir.1999).

FTI and its personnel are clearly independent *expert witnesses* within the meaning of Rule 706. Judge Ezra concluded that an independent expert should be appointed to search Plaintiffs' computer hard drives for potentially relevant emails that may have been "deleted" from the computer programs, but which may still exist on the computer hard drives and can be discovered and retrieved through forensic examination. The forensic expert is also required to determine and report whether emails during the Relevant Period were deleted and whether such deletion occurred under circumstances evincing any effort to destroy or conceal evidence. *Order (# 449).* The order therefore anticipates that the forensic examination may develop new evidence and that FTI will be called upon to testify about its examination findings as they relate to the spoliation of evidence issue.

As is evident from Judge Ezra's statements during the February 23rd hearing, the forensic expert needed to be independent because the expert would be required to provide any potentially relevant emails discovered during the examinations to Plaintiffs' counsel for purposes of making objections and to then provide the emails to the Court for *in camera* review. Only after the Court reviewed the emails and any objections to their production would they be provided to Defendants. It is also clear the Judge Ezra intended that the forensic examination be performed in an impartial manner because the Court or jury is likely to rely on the expert's findings in regard to its efforts to locate and restore any additional relevant emails and/or whether the forensic examination discloses evidence of willful or intentional document destruction or concealment.

■ Rule 706(a) provides that the expert witness shall be informed of his or her duties by the court in writing or at a conference in which the parties shall have the opportunity to participate. Order (# 449) advises FTI of its duties in this case. 29 Wright & Gold, *Federal Practice and Procedure: Evidence* § 6305 (1997) states that after the court informs the expert of his duties and the expert commences work, the court and parties should remain available to answer the expert's questions or refine his instructions where necessary. As a safeguard against bias, these communications should be conducted in a manner open to all parties. *Id., citing Leesona Corp. v. Varta Batteries, Inc.,* 522 F.Supp. 1304, 1312 n. 18 (D.C.N.Y.1981). Ex parte communications between the judge and the expert, or between a party and the expert are discouraged. *Id., citing United States v. Green,* 544 F.2d 138, 146 (3rd Cir.1976) (disapproving of ex parte judicial communication with the expert witness); *Leesona Corp. v. Varta Batteries, supra,* (order prohibiting parties from engaging in ex parte communications with the expert witness.). *See also Crawford v. Greater Cleveland Regional Transit Authority,* 1991 WL 328037 (N.D.Ohio) *1 (order prohibiting *ex parte* communications between court appointed expert and parties' counsel.). *Kenneth C. v. Delonda R.,* 10 Misc.3d 1070(A), 814 N.Y.S.2d 562 (Table), 2006 WL 47429 (N.Y.Fam.Ct.2006) *8, suggests that it is the practice in federal courts to prohibit *ex parte* communications between the court appointed expert witness and the parties' counsel.

Order (# 449), however, does not contain any express provision that prohibits the parties or their counsel from engaging in *ex parte* communication with FTI Consulting during the course of its investigation. It is also clear that Plaintiffs impliedly acquiesced to Defendants' counsel engaging in at least some *ex parte* or unilateral communications with FTI up through June 3, 2009. Plaintiffs' counsel were obviously aware that Defendants' counsel were coordinating the scheduling of the examination of Plaintiffs' computers by FTI's personnel and must therefore be communicating with FTI for that purpose. Arguably, Plaintiffs' counsel should also have known that Defendants' counsel would provide information or documents to FTI that it would need to carry out its assignment, such as the search protocol which FTI would use in order to search the retrieved data for emails and documents relevant to this litigation. *See Order (# 449)*, ¶ 5. There is no evidence that Plaintiffs' counsel objected to Defendants engaging in any *ex parte* or unilateral communications with FTI prior to June 3, 2009.

Although order (# 449) did not explicitly prohibit *ex parte* communications with the independent expert, this is not the end of the Court's analysis. Defendants' attorneys were obviously aware of the Court's repeated statements during the February 23, 2009 hearing that the forensic experts would need to be independent. Defendants' counsel acknowledged this requirement at the hearing and in the emergency motion they filed on April 24, 2009. *Motion (# 441)*, page 15. The Court must determine whether Defendants' counsels' unilateral communications and dealings with FTI went beyond reasonable communications to commence and coordinate the forensic examination, and were of such an extent as to compromise FTI's independence and impartiality.

The Court finds that it was reasonable for Defendants' counsel to contact FTI Consulting prior to entry of order (# 449) to determine if FTI was willing to serve as the independent forensic expert. From the email exchanges between FTI and Defendants' counsel, however, it appears that these initial communications involved two of Defendants' "outside" defense attorneys, George Garvey and Mike Lorenzini, as well as Simon's assistant general counsel Jack Boyd. *Motion (# 451), Exhibit "O"*, pages 5–6. The Court fails to see why it was reasonable or necessary for three of Defendants' attorneys, including an in-house counsel, to participate in the initial contacts with FTI, especially when Plaintiffs' attorneys were not notified or invited to participate in the discussions.

It appears that following their initial discussion(s) with Defendants' counsel that FTI's personnel reviewed Defendants' Spoliation Motion through PACER. Defendants' counsel then provided other case documents to FTI without notifying Plaintiffs' counsel or seeking their consent. Defendants' counsel provided FTI with Plaintiffs' opposition to the Spoliation Motion and Defendants' reply brief, as well as the declarations and exhibits "in support of the spoliation sanction motion." *Motion (# 451), Exhibit "O"*, page 20. Defendants' counsel did not, however, provide FTI with the exhibits to Plaintiffs' opposition. At the July 31st hearing on this motion, Defendants' counsel stated that the failure to provide FTI with Plaintiffs' exhibits was inadvertent or a mistake. Defendants' counsel also suggested that the exhibits were unimportant since FTI had both sides' motion briefs. This, of course, begs the question why Defendants' counsel thought it useful to provide FTI with the exhibits to their motion.

The Court cannot say that FTI's impartiality as the forensic expert was destroyed

by reading the parties' respective briefs on the Spoliation Motion or Defendants' exhibits in support of that motion. It is also conceivable that the documents that Defendants' counsel provided contain some useful background information for the forensic examination. What the Court finds unacceptable, however, is that Defendants provided these documents to FTI and answered various questions that FTI posed to Defendants' counsel, *Motion (# 451), Rutten Affidavit*, ¶ 8, without any consideration to whether these matters should first be discussed with Plaintiffs' counsel and/or whether Plaintiffs should be afforded the opportunity to object or participate in the disclosures to the independent forensic expert.

On May 14, 2009, Defendants' counsel, Mr. Rutten, emailed a copy of order (# 449) to FTI stating that the order "defines the parameters of the forensic examination and the activities to be conducted in connection therewith." *Id., Exhibit "O"*, page 42. In response, Mr. Pace of FTI advised Defendants' counsel that FTI would shortly provide an "engagement document." Mr. Pace further stated: Our current thinking is to consider having both sides ... sign the engagement letter, *in part because the order is entered pursuant to the joint agreement by the parties, and requires us to submit a report to all parties." Id.*, at page 43. (Emphasis added by the Court.).

Mr. Rutten's almost immediate response to Mr. Pace's statement was "Let's have Simon as the engaging party since it's the only one paying the bills." *Id.* The fact that Defendants were responsible for payment of FTI's services, however, does not alter FTI's status as an independent expert, appointed by the Court. The engagement letter that FTI and Defendants subsequently executed on or about May 21, 2009 contained provisions that went beyond Defendants' mere obligation to pay FTI's fees. Although the Court's concern regarding the unilateral nature of this agreement are ameliorated somewhat by the fact that the agreement incorporates the May 14, 2009 order, the agreement created a contractual relationship *solely* between Defendants and FTI. Defendants' counsel did not have the unilateral right to make this contractual decision. Even without FTI's suggestion that both parties sign the engagement agreement, Defendants' counsel should have asked Plaintiffs' counsel whether they desired to be a party to the engagement agreement. It would also have been advisable to submit the engagement agreement to the Court for its approval.

Most disturbing to the Court is Defendants' counsels' decision to invite FTI's personnel to attend an in-person meeting with Defendants' counsel at Simon's offices in Indianapolis, Indiana on May 19, 2009. This was again done without notifying Plaintiffs' counsel of the meeting or, obviously, inviting them to participate. In addition to Mr. Rutten, Defendants' assistant general counsel, Jack Boyd, was present at this meeting. Mr. Rutten defends this meeting in his affidavit as follow:

> The forensic examinations are important to Simon, and Simon is the only one paying FTI's bills, subject to a provision in the Court's Order permitting Simon to shift those costs to Plaintiffs upon an appropriate showing. Although Simon had confidence in the abilities of FTI as an entity, Simon took steps to ensure that the particular FTI personnel who were expected to be involved would be sufficiently knowledgeable and experienced. On May 12, 2009, Simon asked for curricula vitae for the primary personnel who were expected to be involved and it received them the following day. On May 19, 2009, Simon interviewed

three of those personnel in person prior to retaining FTI.

*Motion (# 451), Rutten Affidavit,* ¶ 9.

The foregoing statement would be appropriate if Defendants' counsel was describing his dealings with an expert that Defendants were considering retaining pursuant to Fed.R.Civ.Pro. 26(b)(2). Defendants' counsel's statements, however, are not appropriate in regard to an independent expert who had already been approved by the Court. The forensic examinations are as important to Plaintiffs as they are to the Defendants. Plaintiffs have an equal interest in the qualifications of the FTI personnel who will perform the forensic examinations and upon whose testimony the court or jury may ultimately rely in deciding whether Plaintiffs destroyed or concealed relevant evidence. Even as to the expert fees that Defendants are obligated to pay, Plaintiffs have an interest that FTI's ability to perform the forensic examination is not compromised by cost limitations that Defendants might impose on FTI's services. There is also the possibility that such fees may later be imposed on Plaintiffs. *Order (# 449),* ¶ (7). Plaintiffs' counsel had the right to participate in such discussions and should have been afforded the opportunity to do so.

Nor is the Court persuaded of the legitimate need for Defendants' counsel to meet with FTI's personnel at Defendants' corporate headquarters in Indianapolis. Defendants had already represented to the Court on April 24th that FTI Consulting is "a nationally renowned expert in this area." FTI provided Defendants' counsel with the curricula vitae for Mr. Pace, Mr. Harrison and Mr. Matrejek on May 13, 2009. *Motion (# 451), Exhibit "O",* pages 24–41. Those documents appear to establish each consultant's qualifications, knowledge and experience without the necessity for Mr. Rutten and Mr. Boyd to meet them in person to assess their qualifications or competency. The meeting with FTI's personnel, by its nature, was fraught with the potential that Defendants' counsel would engage in discussions with FTI's personnel about the merits of the spoliation claim or how the examination would be conducted that could compromise its impartiality. Even if the Court assumes that Defendants' counsel and FTI's personnel scrupulously avoided any discussion about the merits of Defendants' spoliation claim or the details of the forensic examination, the meeting by its nature contributes to the impression that Defendants' were asserting or attempting to assert unilateral influence and control over FTI. Clearly, no such meeting should have taken place without Plaintiffs' prior knowledge and consent, and, if objection was made, Court authorization.

Finally, the Court finds that it was improper for Defendants' counsel to involve FTI's consultants in their attempt to obtain information from Plaintiffs as to "whether data from the 'possibly water damaged' laptop was copied onto other computers used by Scott Gordon." Defendants' counsel argue that it is within the scope of FTI's forensic investigation to seek such information. The Court disagrees. FTI's assignment in this case is to perform a technical forensic examination of the computer hard drives which may contain Scott Gordon's emails and to retrieve those emails. FTI is also charged with determining, based on its forensic examination of the computers, "whether emails from the Relevant Period have been deleted, and if so, when they were deleted; how they were deleted ...; who deleted them; whether they were deleted piecemeal, en masse, or in some combination thereof; and whether any of the data can be restored." *Order (# 449).* Presum-

ably, if data from Scott Gordon's possibly water damaged laptop computer was transferred to one of the computers that FTI will be examining, then FTI may find evidence of that data during the forensic examination. That, however, is the extent of FTI's assignment. The order does not authorize FTI to conduct an investigation or interview the parties or other witnesses in order to gather evidence or information that may be relevant to the spoliation issue.

Judge Ezra's statements during the February 23, 2009 hearing, as well as in his written order (# 437) entered on March 9, 2009, demonstrate Judge Ezra's belief there is a potentially significant issue of spoliation based on Plaintiffs' failure to produce relevant emails of Scott Gordon. This Court is therefore reluctant to order or recommend that the independent forensic examination that Judge Ezra authorized on February 23, 2009 be revoked. The Court, however, cannot ignore Defendants' counsels' misconduct in dealing with the court-appointed forensic expert. It was clearly the Court's intention that the forensic examination be *independent* and that obviously means that it be conducted in an *impartial* manner. The totality of the circumstances demonstrate that Defendants' counsel dealt with FTI as if it was Defendants' owned retained expert whose conduct they control, rather than an inde-

pendent court-appointed expert subject to the provisions of Rule 706(a). By their conduct, Defendants' counsel have compromised FTI's appearance of independence and have thereby diminished the assurance that the forensic examination will be performed in an impartial manner.[2]

Arguably, if this case was still in the discovery period, the Court might allow FTI to proceed with its forensic examination and permit each party to retain its own forensic expert who could, at minimum, evaluate and criticize FTI's findings and conclusions. Alternatively, the Court might disqualify FTI and permit another independent expert to be appointed in its stead. The appointment of an independent expert in this case, however, arose after discovery had ended. It is clear that the District Judge intended that the independent forensic examination would be the only additional evidence to be obtained on the spoliation issue and that it was anticipated that the Court would rely on the findings of the independent forensic expert.

Because Defendants' counsel have acted improperly and have compromised the forensic expert's impartiality, Defendants have forfeited the opportunity to obtain an independent forensic examination. To permit the forensic examination to go forward either through FTI, whose impartiality is now impaired, or through the ap-

---

2. During the July 31st hearing on the motions, Defendants' counsel cited the statement made by Plaintiffs' counsel, Mr. Weil, during the July 2nd status hearing that Plaintiffs are not claiming that FTI is corrupt. Defendants argued that this is a concession that the FTI's impartiality has not been impaired. Mr. Weil's actual statement, however was as follows:

So, in many respects, much of our application is based on admitted conduct that was not contemplated by the Court and never permitted by the Court. And which was— and the treatment of FTI akin to the way

one would treat your privately retained expert.
So in that respect, that, we maintain is conduct that is not in dispute. If we want to go beyond that into the question of when we were not—I mean we're not claiming here initially that FTI is corrupt. What we are claiming is that the independent relationship that was anticipated by the Court and the strict order that the Court put in place corrupted the relationship that the Court intended.
*Transcript (# 464), July 2, 2009 status hearing,* page 8.

pointment of another independent expert would be unjustified. Although this may unfortunately result in the loss of relevant evidence, i.e., the missing emails, Defendants and their counsel have only themselves to blame. In this respect, the Court rejects any assertion by Defendants that Plaintiffs' alleged previous delay or stonewalling justified their conduct *vis a vis* the independent expert.

For the reasons set forth in the body of these Findings & Recommendations, the Court agrees with the gist of Mr. Weil's full statement.

Even if Defendants had not forfeited their right to obtain an independent forensic examination, the Court would deny Defendants' request that Plaintiffs be required to answer most of their proposed interrogatories about the 2003 laptop computer or its "progeny." *See Motion (# 451), Exhibit "R."* Although Mr. Pocker's May 29, 2009 letters appears to indicate that Plaintiffs have no information about the current whereabouts of the 2003 laptop or other computers to which its data was transferred, the Court probably would require Plaintiffs to provide additional information, if they have any, which may reasonably lead to the discovery of the present location of the 2003 laptop computer or of any computer to which its data may have been transferred. Because the Court concludes that Defendants are no longer entitled to a forensic examination of Plaintiffs' computers, however, this request should also be denied.

### CONCLUSION

Based on the foregoing, this Court concludes that the May 14, 2009 order regarding the forensic examination, as well as the District Court's previous verbal and written orders authorizing the independent forensic examination requested by Defendants, should be revoked. Because this requires the reversal or revocation of the District Judge's previous orders, the undersigned Magistrate Judge respectfully submits them as recommendations to the District Judge. Accordingly,

### RECOMMENDATION

**IT IS RECOMMENDED** that Defendants' Second *Emergency* Motion to Enforce Orders Regarding Forensic Examinations and Related Relief (# 451) be **denied.**

**IT IS RECOMMENDED** that Plaintiffs' Counter–Motion to Vacate Court's May 14, 2009 Order, Modify Court's March 9, 2009 Order, and Related Relief (# 452, # 453) be **granted** as follows:

(1) That the May 14, 2009 order and the Court's previous verbal and written orders authorizing an independent forensic examination of Plaintiffs' computers be revoked; and

(2) That all computer materials obtained from Plaintiffs by FTI be returned to Plaintiffs.

If the foregoing Recommendations are adopted by the District Judge, then it would appear that no further basis exists for Defendants to file another "spoliation motion." This Court, however, leaves it to the District Judge to decide whether its March 9, 2009 Order (# 437) should be modified to now deny Defendants's Spoliation Motion with prejudice.